In re JONES TRUCK LINES, INC., an Arkansas Corporation, Debtor.

JONES TRUCK LINES, INC., Plaintiff,

v.

IXL MANUFACTURING COMPANY, INC., Exod Industries Division, Hartwell Brothers Division, Defendants.

Bankruptcy No. 91–15475M.
Adv. No. 93–8858.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Oct. 14, 1994.

Charles T. Coleman, Wright, Lindsey & Jennings, Little Rock, AR, for Jones Truck Lines, Inc.

Thomas B. Staley, Little Rock, AR, for IXL Mfg. Co., Inc.

## ORDER

JAMES G. MIXON, Chief Judge.

On the July 9, 1991, Jones Truck Lines, Inc. (Jones) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. On July 7, 1993, Jones filed a complaint for turnover of property and for money judgment against IXL Manufacturing Company, Inc. (defendant). Jones sought to recover the sum of $15,703.34, plus interest, representing undercharges for the transportation of freight.

The defendant filed a timely answer to the complaint. The Court invited counsel for the defendant to file a motion to withdraw the reference under the provisions of 28 U.S.C. § 157(d) (1988).[1] No motion to withdraw the reference was filed and no party objects to this Court's jurisdiction.

On April 28, 1994, the defendant filed a motion for summary judgment pursuant to Federal Bankruptcy Rule of Procedure 7056 and Jones has filed a response opposing the motion. Both sides have filed appropriate pleadings, affidavits and briefs and have presented their oral arguments to the Court.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) (1988), and the Court has jurisdiction to enter a final judgment in the case.

## DISCUSSION

Summary judgment should be granted only where it appears that there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Fed. R.Bankr.P. 7056; *Fields v. Gander*, 734 F.2d 1313, 1314 (8th Cir.1984); *Toshiba Am. Inc. v. Video King, Inc. (In re Video King, Inc.)*, 100 B.R. 1008, 1012 (Bankr.N.D.Ill.1989). In determining whether a genuine issue of material fact exists, the Court must view the facts in the light most favorable to the party opposing the motion for summary judgment and must give that party the benefit of all reasonable inferences drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987); *Fields v. Gander*, 734 F.2d at 1314. To be material, the fact in dispute must affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A party opposing a motion for summary judgment may not rely upon the mere allegations of its pleadings but must instead set forth, by affidavit or otherwise, specific facts showing that a genuine issue exists for trial. Fed.R.Civ.P. 56(e); Fed.R.Bankr.P. 7056. *See Chauffeurs, Teamsters & Helpers Local Union 238 v. C.R.S.T., Inc.*, 795 F.2d 1400, 1402–03 (8th Cir.) (en banc), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

At issue is a complex question of statutory interpretation of the Negotiated Rates Act of 1993 (NRA), Pub.L. No. 103–180, 107 Stat. 2044 (1993), which amends certain sections of the Interstate Commerce Act found in 49 U.S.C. § 10101, et seq. The facts necessary to decide the motion for summary judgment are not in dispute and are summarized as follows.

Jones filed a voluntary petition for relief in 1991 under the provisions of chapter 11 of the United States Bankruptcy Code. Immediately upon filing for protection, Jones

---

1. Section 157(d) provides that "[t]he district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (1988).

ceased operations and began liquidating itself. No liquidating plan of reorganization has been filed. Jones alleges in its complaint for turnover that at all relevant times it "had on file with the Interstate Commerce Commission ... lawful tariffs in full force and effect containing lawful rates and charges applicable to the transportation services performed for defendant under the freight bills issued by plaintiff." Jones alleges that an audit of shipments handled by Jones for the defendant revealed that the defendant had underpaid Jones the total sum of $15,703.34 for which Jones demands judgment. The defendant denies all of Jones's allegations and raises several affirmative defenses.

On April 28, 1994, the defendant filed a motion for summary judgment alleging that pursuant to the NRA, it is a small business and Jones is precluded by the terms of the NRA from prosecuting undercharge claims against it.[2] Jones concedes that the defendant qualifies as a small business under the NRA; however, Jones argues that the NRA, by its own terms, has no applicability in a bankruptcy case. In the alternative Jones argues that the NRA is unenforceable in a case under title 11 by virtue of the anti-forfeiture provisions of 11 U.S.C. § 541(c)(1)(B) (1988).

I

BACKGROUND

The Interstate Commerce Act was originally passed in 1887. *See* 49 U.S.C. § 1001 (1887). The Act has been amended numerous times, and it has been an important part of the law of commerce for over 100 years. The Interstate Commerce Commission (ICC) regulates interstate commerce of common carriers "to insure that rates are both reasonable and nondiscriminatory." *Maislin Indus. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 119, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94

(1990). The Act provides that a "common carrier ... may not subject a person, place, port, or type of traffic to unreasonable discrimination." *Maislin,* 497 U.S. at 119, 110 S.Ct. at 2762.

The Supreme Court has strictly interpreted the Interstate Commerce Act. This strict interpretation became known as the "filed rate doctrine," and was described by the United States Supreme Court in *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915) as follows:

Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice, of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville R.R.,* 237 U.S. at 97, 35 S.Ct. at 495.[3]

The Supreme Court in *Maislin* outlined one of the relevant functions of the ICC in administering the Interstate Commerce Act as follows:

The Act requires a motor common carrier to "publish and file with the Commission tariffs containing the rates for transportation it may provide." 49 U.S.C. § 10762(a)(1) (1982). The Act also specifically prohibits a carrier from providing services at any rate other than the filed (also known as the tariff) rate:

---

**2.** Section 10701(f)(9)(A) provides that: Claims involving small-business concerns, charitable organizations, and recyclable materials. Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—(A) if such person

qualifies as a small-business concern under the Small Business Act 15 U.S.C. § 631 et seq.) 49 U.S.C. § 10701(f)(9)(A).

**3.** Deviation from the filed rate may result in the imposition of civil or criminal sanctions on the carrier or shipper. *See* 49 U.S.C. §§ 11902–11904.

"Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device." § 10761(a).

*Maislin,* 497 U.S. at 120, 110 S.Ct. at 2762.

The Supreme Court also described the justification for the filed rate doctrine:

This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. *See* S.Rep. No. 46, 49th Cong., 1st Sess., 181, 188–190, 190–200 (1886). As the Commission itself found: "[P]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates." *Poor v. Chicago, B. & O.R. Co.,* 12 I.C.C. 418, 421–422 (1907).

*Maislin,* 497 U.S. at 127–128, 110 S.Ct. at 2766.

In 1980, Congress passed the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980), which deregulated to a considerable extent the trucking industry. In *Seaboard Sys. R.R., Inc. v. United States,* 794 F.2d 635 (11th Cir.1986), the Eleventh Circuit Court of Appeals held that the ICC had authority to modify its interpretation of the filed rate doctrine and permit the defense of waiver based on carrier rate misquotations. *Seaboard,* 794 F.2d at 638. The change in the ICC's interpretation of the filed rate doctrine was in response to the Motor Carrier Act of 1980. *See National Indus. Transp. League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 3 I.C.C.2d 99 (1986).

The Eighth Circuit Court of Appeals also held that the ICC had authority to modify its interpretation of the filed rate doctrine and permit the defense of unreasonable practices provided by 49 U.S.C. § 10704(a). *See Maislin Indus. v. Primary Steel, Inc.,* 879 F.2d 400, 405 (8th Cir.1989), *rev'd,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Supreme Court reversed the Eighth Circuit in *Maislin Indus. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Supreme Court stated:

Although the Commission has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, *see American Trucking Assns., Inc. v. Atchison, T. & S.F.R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967), it does not have the power to adopt a policy that directly conflicts with its governing statute. Nothing in the MCA repeals §§ 10761 and 10762 or casts doubt on our prior interpretation of those sections. Generalized congressional exhortations to "increase competition" cannot provide the ICC authority to alter the well-established statutory filed rate requirements. As we said in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* [476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413] with respect to a similarly longstanding judicial interpretation of the Act:

"Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme, which had been a significant part of our settled law for over half a century, and ... Congress did not see fit to change it when Congress carefully reexamined this area of the law in 1980. [Respondent has] pointed to no specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding ... construction; harmony with the general legislative purpose is inadequate for that formidable task."

476 U.S., at 420, 106 S.Ct. at 1928–1929 (footnotes omitted).

*Maislin,* 497 U.S. at 134–35, 110 S.Ct. at 2770.

## II

## IS THE NRA APPLICABLE IN BANKRUPTCY CASES?

In direct response to the *Maislin* decision, Congress undertook an effort to legislate a change in the law by the passage of the NRA, which became law in December 1993. Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (1993). The NRA changed many of the procedures applicable to resolving disputes over rates charged by shippers. The NRA is applicable to "all claims pending as of the date of the enactment of this Act and to all claims arising from transportation shipments tendered on or before the last day of the 24–month period beginning on such date of enactment of this Act." Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (1993).

The portion of the NRA relevant to the issue of whether the NRA is applicable in bankruptcy cases is contained in Section 9 of the Act and provides as follows:

> Limitation on Statutory Construction. Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

Negotiated Rates Act of 1993, Pub.L. No. 103–180, § 9, 107 Stat. 2044 (1993).

Jones argues that Section 9 has the effect of making the NRA inapplicable in bankruptcy. The defendants argue that Jones's construction of Section 9 will lead to an absurd result in light of the legislative history of the NRA.

Several district courts, including two in the Western District of Arkansas and one in the Eastern District of Arkansas, have considered the issue of whether Section 9 renders the NRA inapplicable in bankruptcy court.

In each of the decisions, the Courts quoted many portions of the legislative history that support a finding that the proposed legislation was intended to overrule the Supreme Court's decision in *Maislin. See, e.g., Jones Truck Lines, Inc. v. Alliance Rubber Co.,* 166 B.R. 691, 692–93 (W.D.Ark.1994); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1299–1301 (E.D.Ark.1994). For example, the Senate Report accompanying the NRA provided, in part, as follows:

### PURPOSE OF THE BILL

The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by trustees for bankruptcy motor carriers or nonhousehold goods forwarders to collect additional amounts for past transportation provided, in certain instances where the agreed-upon rate or charge allegedly was not properly or timely filed in a tariff with the Interstate Commerce Commission (ICC) as required under the interstate commerce provisions of title 49, U.S.Code (referred to in this report as the Interstate Commerce Act, or "ICA").

. . . .

### BACKGROUND AND NEEDS

Recent public and media attention has highlighted the trucking "undercharge crisis" affecting shippers in virtually every State of the Nation. In one major trucking company bankruptcy case alone, for example, the bankruptcy trustee has initiated more than 30,000 separate collection actions against shippers across the country, seeking as much as $1.5 billion in alleged undercharges. The Committee has received reports that the total amount of undercharges at issue has grown from an estimated $200 million in 1990 to at least several billion dollars today.

### GENESIS OF ISSUE

The Motor Carrier Act of 1980 (1980 MCA) substantially deregulated the inter-

state trucking industry. The flood of new motor carriers (caused by eased entry) depressed rates for interstate shipments, and many established trucking companies were soon forced to offer steep rate discounts to retain market share. In many cases, however, carriers failed to file tariffs with the ICC to reflect the discounted rates negotiated with shippers. Such rates frequently remained unfiled, despite the fact that the 1980 MCA continued a preexisting requirement under the ICA that motor common carriers file tariff rates with the ICC and that these traffics would be applicable to all shippers seeking similar transportation movements. (This requirement is known as the "filed tariff doctrine.")

By the late 1980s, many LTL motor carriers had failed, leaving thousands of employees (many of them unionized) out of work. In the wake of these trucking bankruptcies, court-appointed trustees sought to maximize assets available to unsecured creditors, such as unpaid employees and underfunded pension plans. Trustees sued shippers and others, claiming that rates charged for specified shipments years before had undercut the carrier's tariff filed with the ICC but that the carrier had never filed this lower rate with the ICC as required under the ICA. (Shippers have no legal obligation to file rates with the ICC.) Since the carrier's negotiated rate was unfiled and, therefore, allegedly illegal, trustees argued that the undercharge—the difference between the rate paid and the rate then in the carrier's tariff—was now due. Undercharge claims reflecting this difference, initiated in many cases years after the actual transportation was provided and the negotiated price was paid in full, multiplied quickly. It has been estimated that the amount in dispute concerning unfiled rates (as compared with other theories of undercharge liability) may exceed $1 billion.

The ICC attempted to resolve the undercharge issue in favor of shippers by ruling undercharge collection efforts to be an "unreasonable practice" under the ICA and therefore invalid. Five of six U.S. Circuit Courts of Appeals which reviewed this matter ruled to uphold the ICC's authority, but the Supreme Court (Court) overturned the ICC's position in *Maislin Indus., U.S. v. Primary Steel, Inc.,* 497 U.S. 116 [110 S.Ct. 2759, 111 L.Ed.2d 94] (1990). The Court held, in accordance with the ICA, that a carrier's filed tariff rate is the only legal rate, notwithstanding the equitable defenses of shippers that no other shippers or competing carriers have been harmed by the lower negotiated rate or the carrier's failure to file it. In affirming the filed rate doctrine of the ICA, however, the Court specifically cited Congress' responsibility ameliorate any perceived inequities resulting from this strict application of the ICA with respect to undercharge claims based on unfiled rates.

## EVENTS AFTER MAISLIN

Relying on the Maislin holding, bankruptcy trucking company trustees have continued to litigate undercharge claims against shippers based on the difference between the unfiled negotiated rate and the filed tariff rate. Trustees also have pursued several additional legal theories of undercharge liability. Trustees have attempted, for example, to invalidate past contracts with shippers, alleging technical errors. Having unilaterally declared a past contract to be invalid, the trustee then seeks to collect the higher, filed common carrier tariff rate which allegedly now applies in the absence of contract carriage. Under another undercharge theory, the trustee determines that the shipper did not "timely" pay for services rendered years ago, and claims that such an alleged violation of the ICC's credit regulations retroactively renders invalid the discount tariff rate under which the shipment moved, with the higher, undiscounted tariff rate now asserted to be due.

S.Rep. No. 79, 103rd Cong., 1st Sess. (1993).

However, Section 9 of the NRA has additional legislative history that supports the argument advanced by Jones. A portion of this history was discussed by the bankruptcy court in *Cooper v. E.I. DuPont De Nemours & Co. (In re Bulldog Trucking, Inc.),* No. 92–

3100, 1994 WL 197420 (Bankr.W.D.N.C. Feb. 18, 1994), *recommendations adopted,* 173 B.R. 517 (W.D.N.C.1994) as follows:

On November 10, 1993 Chairman Jack Brooks of the House Committee on the Judiciary requested a sequential referral of H.R. 2121 for review by the Judiciary Committee. In requesting a sequential referral, Chairman .Brooks explained:

The Committee on the Judiciary has had no opportunity whatsoever to review [H.R. 2121] and consider its impact on the bankruptcy system, administrative law and the jurisdiction of the federal courts. Such an opportunity is essential if the Committee is to carry out its mandate to ensure the integrity and consistency of the Code in these areas of the law.

By letter dated November 15, 1993, Representative Norman Mineta, a principal sponsor of H.R. 2121 and the Chair of the House Committee on Public Works and Transportation, confirmed to the Chair of the Judiciary Committee that:

Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects [sic] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue your request for a sequential referral.

At the request of the Chair of the House Judiciary Committee, the above-quoted letter from Representative Mineta was included in full in the November 15, 1993 report on H.R. 2121 by the House Committee on Public Works and Transportation.

Also on November 15, 1993, the House Committee on Public Works and Transportation favorably reported H.R. 2121 as amended. As amended, H.R. 2121 contained a new section 9, which provided:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affect-

ing applicability of title 11, United States Code, relating to bankruptcy, or the Employment Retirement Income Security Act of 1974.

On November 15, 1993 the text of Section 9 was further amended to provide as follows:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

On November 15, 1993, on the floor of the House, Mr. Mineta, the principal sponsor of H.R. 2121 and the Chair of the House Committee of Public Works and Transportation, explained the above-quoted revised (and final) version of Section 9 of H.R. 2121:

Finally, Mr. Speaker, I would note that we have made a few technical and clarifying amendments to the bill today. Among them, we are clarifying in section 9 of the bill that we do not intend in this legislation to affect either the bankruptcy code or the jurisdiction of the bankruptcy courts, matters over which our committee does not have jurisdiction.

The text of H.R. 2121 as amended was thereafter substituted for the text of S. 412. As amended, it was enacted by Congress and on December 3, 1993 was signed into law by the President as Public Law No. 103–180, i.e., the NRA. The House Judiciary Committee never held hearings on the NRA before its enactment.

*In re Bulldog Trucking,* No. 92–3100, 1994 WL 197420, at *5–7 (Bankr.W.D.N.C. Feb. 18, 1994), *recommendations adopted,* 173 B.R. 517 (W.D.N.C.1994).

All but one of the district courts that have considered the issue of whether the NRA is applicable in bankruptcy cases have ruled that Section 9 should not be construed to preclude the NRA's applicability in bankruptcy cases because to do so would produce

an absurd result and be patently at odds with Congress's intent in enacting the NRA. *See, e.g., Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.)*, No. 91–1077–CIV–J–16, 1994 WL 519044, at *7 (M.D.Fla. July 28, 1994); *Jones Truck Lines, Inc. v. Phoenix Prods. Co., Inc. (In re Jones Truck Lines, Inc.)*, 860 F.Supp. 1360, 1366 (E.D.Wis.1994); *Jones Truck Lines, Inc. v. Whittier Wood Prods., Inc. (In re Jones Truck Lines, Inc.)*, No. 94–5071, 1994 WL 525534, at *5 (W.D.Ark. July 18, 1994); *Jones Truck Lines, Inc. v. White Mop Wringer Co., (In re Jones Truck Lines, Inc.)*, No. 94–5050, 1994 WL 525552, at *1 (W.D.Ark. July 18, 1994); *Allen v. Spiegel, Inc.*, 169 B.R. 394, 396 (N.D.Ill.1994); *Jones Truck Lines, Inc. v. Polyflex Film & Converting, Inc.*, No. 3:93–CV319, 1994 WL 499743, at *3 (S.D.Miss. June 10, 1994); *Jones Truck Lines, Inc. v. Frigid Fluid Co.*, 169 B.R. 52, 55 (N.D.Ill.1994); *Jones Truck Lines, Inc. v. Grinnell Corp.*, 167 B.R. 488, 493 (N.D.Ill.1994); *Lewis v. Columbus McKinnon Corp.*, No. 93–1004, 1994 WL 525510, at *3 (W.D.Tenn. Apr. 29, 1994); *Lewis v. H.E. Wisdom & Sons, Inc.*, No. 93–C–0985, 1994 WL 110659, at *5–6 (N.D.Ill. Mar. 31, 1994); *Jones Truck Lines, Inc. v. Admiral Marine Co.*, 858 F.Supp. 71, 72 (E.D.La.1994); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F.Supp. 1296, 1306 (E.D.Ark.1994); *Allen v. ITM, Ltd. South*, 167 B.R. 63, 66 (M.D.N.C.1994); *Jones Truck Lines, Inc. v. Alliance Rubber Co.*, 166 B.R. 691, 693 (W.D.Ark.1994); *Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.*, No. 3–93–0442, 1994 WL 150154, at *4–5 (M.D.Tenn. Feb. 14, 1994). *But see Cooper v. E.I. DuPont De Nemours & Co. (In re Bulldog Trucking, Inc.)*, No. 92–3100, 1994 WL 197420 (Bankr.W.D.N.C. Feb. 18, 1994), *recommendations adopted*, No. 92–3100, slip op. (W.D.N.C. June 21, 1994).[4]

Numerous decisions give guidance as to proper statutory construction. The Supreme Court has stated that the starting point in every case involving statutory construction is the language of the statute itself. *Kelly v.*

*Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975)). The Court stated further that "the text is only the starting point" and cautioned that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly*, 479 U.S. at 43, 107 S.Ct. at 357 (quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986). But where the language is plain, "the sole function of the courts is to enforce [the statute] according to its terms." *Kelly*, 479 U.S. at 43, 107 S.Ct. at 357.

 The plain meaning of legislation should be conclusive except when the literal application of the statute would produce a result demonstrably at odds with the intention of its drafters. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such cases, the intention of the drafters, rather than the strict language controls. *Griffin*, 458 U.S. at 571, 102 S.Ct. at 3250. Chief Justice Rehnquist observed in *Griffin*, that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin*, 458 U.S. at 575, 102 S.Ct. at 3252.

 In applying these rules of construction in this case, the analysis begins with the operative words in Section 9 of the NRA which are:

> [n]othing in this Act ... shall be construed as limiting or otherwise affecting application of title 11 ..., relating to bankruptcy; [or] title 28 ... relating to the jurisdiction of the [bankruptcy] courts.

Negotiated Rates Act of 1993, Pub.L. No. 103–180, § 9, 107 Stat. 2044 (1993).

Section 9 does not specifically state that the NRA will not have any affect on a bankruptcy proceeding, or on bankruptcy jurisdiction; Section 9 only states that the NRA will

---

**4.** The bankruptcy court for the district of Utah recently held that the plain language of Section 9 makes the NRA inapplicable to bankruptcy cases.

*Rushton v. Saratoga Forest Prods., Inc. (In re Americana Expressways, Inc.)*, 172 B.R. 99, 103–04, (Bankr.D.Utah 1994).

not limit or otherwise affect application of title 11 or title 28. Therefore, in a narrow sense the NRA does not limit or affect the specific provisions of either title 11 or title 28 relating to bankruptcy law; rather, the NRA alters nonbankruptcy law found in title 49. This alteration has the effect of preventing an existing cause of action from passing into the bankruptcy estate or causing a cause of action to no longer be property of the bankruptcy estate under certain circumstances, but it does not specifically limit or affect the applications of title 11 or title 28. In other words, Section 9 may be construed to mean that the NRA does not repeal any provisions of title 11 or title 28.

Admittedly, construing a statute this strictly is not completely satisfactory. However, as three district courts in Arkansas have pointed out, construing Section 9 to exclude applicability of the NRA to bankruptcy cases would produce an absurd result in light of the NRA's legislative history. *Jones Truck Lines, Inc. v. Whittier Wood Prods., Inc. (In re Jones Truck Lines)*, No. 94–5071, 1994 WL 525534, at *5 (W.D.Ark. July 18, 1994); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F.Supp. 1296, 1306 (E.D.Ark.1994); *Jones Truck Lines, Inc. v. Alliance Rubber Co.*, 166 B.R. 691, 693 (W.D.Ark.1994). This narrow construction avoids an absurd result and is consistent with Chief Justice Rehnquist's theory of using an "alternative interpretation consistent with the legislative purpose." *Griffin*, 458 U.S. at 575, 102 S.Ct. at 3252. Therefore, Section 9 does not render the NRA inapplicable in a bankruptcy case.

## III

### DOES THE NRA VIOLATE THE ANTI-FORFEITURE PROVISIONS OF 11 U.S.C. § 541(c)(1)(B)?

■ The same legislative history which supports the conclusion that Section 9 does not render the NRA inapplicable in a bankruptcy case concurrently supports the conclusion that the provisions of the NRA are unenforceable in a bankruptcy case because

of the anti-forfeiture provisions of 11 U.S.C. § 541(c)(1)(B) (1988).

■ Section 541(a) defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a) (1988). Section 541(a) does not determine the issue of the debtor's property interest in a particular asset; this issue is determined by nonbankruptcy law. *California v. Farmers Mkts., Inc. (In re Farmers Mkts., Inc.)*, 792 F.2d 1400, 1402 (9th Cir. 1986); 4 *Collier on Bankruptcy* ¶ 541.02[1] (Lawrence P. King, ed., 15th ed. 1994).

■ A cause of action is property of the estate. *In re Smith*, 640 F.2d 888, 890 (7th Cir.1981); 4 *Collier on Bankruptcy* ¶ 541.-10[1] (Lawrence P. King, ed., 15th ed. 1994). The debtor's cause of action to recover freight undercharges in this case is a statutory right created by Congress [5] and, but for, the provisions of the NRA, the cause of action would constitute property of the estate.

Section 541(c)(1)(B) provides in relevant part that:

[A]n interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

. . . .

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B) (1988).

■ Section 541(c)(1)(B) is referred to as an "anti-forfeiture" provision of the Bankruptcy Code. *Collier on Bankruptcy* explains Section 541(c)(1)(B) as follows:

Section 541(c)(1) of the Code departs sharply from the Act by rendering ineffec-

---

**5.** *See* 49 U.S.C. § 10761(a).

tive restrictions or conditions on transfer.... Thus restraints on alienation and equitable servitudes are ineffective to prevent property from becoming property of the estate.

4 *Collier on Bankruptcy* ¶ 541.22 (Lawrence P. King, ed., 15th ed. 1994). "Applicable nonbankruptcy law" includes federal statutory law. *Patterson v. Shumate,* —— U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992). If a forfeiture provision effective under nonbankruptcy law has the effect of forfeiting the debtor's interest in property because of the bankruptcy or financial condition of the debtor, 11 U.S.C. § 541(c)(1)(B) renders such a provision unenforceable in a bankruptcy case. *See National Union Fire Ins. Co. v. Camp (In re Government Secs. Corp.),* 972 F.2d 328, 330–31 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993) (clause in fidelity bond terminating coverage if trustee appointed to liquidate held unenforceable in SIPA bankruptcy); *United States v. Devall,* 704 F.2d 1513, 1518 (11th Cir.1983) (anti-assignment provisions of social security act held unenforceable in chapter 13 bankruptcy case); *Cutler v. Cutler (In re Cutler),* 165 B.R. 275, 277–79 (Bankr.D.Ariz.1994) (provision in partnership agreement which required bankrupt partner to submit to buy out by other partners at book value held unenforceable on a chapter 7 trustee); *Mumpfield v. Leavell (In re Mumpfield),* 140 B.R. 578, 580–81 (Bankr.M.D.Ala.1991) (state law permitting forfeiture under land sales contract held not enforceable in chapter 13 case).[6]

The defendant argues that the NRA's forfeiture provisions are not conditioned on the filing of a bankruptcy petition or the financial condition of a debtor, but rather are conditioned on the debtor's status as a nonoperating carrier. Jones argues that even though the operative words are "nonoperating carrier" as opposed to "bankrupt carrier" or "insolvent carrier," the NRA as applied is conditioned on the debtor's financial condition.

The specific language used by Congress to describe the condition which must occur for the NRA's exemption provisions for undercharge claims to apply is when a "motor carrier of property ... [is] no longer transporting property." The bankruptcy court in *In re Bulldog Trucking* observed that basing the applicability of the NRA on a debtor's nonoperating status and the resulting lack of current operating revenues is, in substance, referring to a specified financial condition within the meaning of 11 U.S.C. § 541(c)(1)(B). *Cooper v. E.I. DuPont De Nemours & Co. (In re Bulldog Trucking, Inc.),* No. 92–3100, 1994 WL 197420, at *13 (Bankr.W.D.N.C. Feb. 18, 1994), *recommendations adopted,* 173 B.R. 517 (W.D.N.C. 1994).

■ The fact that the forfeiture provision is not literally conditioned on the filing of a bankruptcy petition or the debtor's financial condition does not exempt it from the terms of the anti-forfeiture provision of title 11, where the precise reason for the forfeiture is, in fact, the bankruptcy or financial condition of the debtor. *See Connolly v. Nuthatch Hill Assocs. (In re Manning ),* 831 F.2d 205, 210–11 (10th Cir.1987); *Gulf Tampa Drydock Co. v. Insurance Co. of N. Am. (In re Gulf Tampa Drydock Co.),* 49 B.R. 154, 157 (Bankr.M.D.Fla.1985); *Holland Am. Ins. Co. v. Sportservice, Inc. (In re Cahokia Downs, Inc.),* 5 B.R. 529, 531 (Bankr.S.D.Ill.1980).

■ Some of the district courts that have considered this issue have pointed out that the word "nonoperating" is not synonymous with the phrase "financial condition." *See North Penn Transfer, Inc. v. Polykote Corp.,* 170 B.R. 565, 567 (E.D.Pa.1994); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1305 (E.D.Ark.1994). Even though nonoperating is not a synonym for financial condition, whether a business has ongoing operations is certainly a part of the financial condition of the business. A business's financial condition is the broader concept which necessarily includes the operating or nonoperating status of that business. To say the operating status of a business is not a financial condition of the business is to ignore reality.

---

6. The defendants do not argue that passage of the NRA subsequent to passage of section 541(c)(1)(B) constituted an implied repeal of section 541(c)(1)(B). Section 9 of the NRA discussed previously, eliminates the validity of any such argument.

As the legislative history of the NRA indicates, the nonoperating status of a motor carrier is a condition typically attendant to a bankrupt motor carrier case. Not one word appears in the legislative history of the NRA complaining of the actions of a nonoperating nonbankrupt carrier. The legislative history could not be more clear that the intent of Congress was to prohibit trustees in bankruptcy cases from bringing undercharge actions in bankruptcy court. The Senate Report states:

The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by trustees for bankruptcy motor carriers....

S.Rep. No. 79, 103rd Cong., 1st Sess. 1 (1993).

The House Report States:

The purpose ... as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates brought about by trustees for non-operating motor carriers for past transportation services.

H.Rep. No. 359, 103rd Cong., 1st Sess. 7 (1993).

 Congress chose not to amend or repeal 11 U.S.C. § 541(c)(1)(B) (1988), which renders the very forfeiture provisions created by Congress in the NRA unenforceable in bankruptcy cases. Congress cannot lawfully circumvent the protections it provided to debtors under 11 U.S.C. § 541(c)(1)(B) (1988) by casting the operative words in the euphemistic phrase "no longer transporting property." The fact that the forfeiture provision of the NRA is also applicable to nonoperating carriers that do not seek relief under title 11 does not change the fact that Congress's primary focus in enacting the NRA was to remedy the problem of trustees of nonoperating carriers in bankruptcy cases filing undercharge actions.

What the NRA attempts to do is indistinguishable in principle from the facts in *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. 676 (Bankr.M.D.Fla.1991). In that case the bankruptcy court held that a similar anti-forfeiture provision found in 11 U.S.C. § 365 voided a provision of an automobile franchise agreement which purported to forfeit the debtor's franchise if the debtor ceased operating for more than ten days. *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. at 679.

As the United States Supreme Court stated in *Griffin*, "[l]aws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lie with the law making authority, and not with the courts." *Griffin*, 458 U.S. at 575, 102 S.Ct. at 3252 (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)).

Therefore, the provisions of the NRA are unenforceable in a bankruptcy case because of the anti-forfeiture provisions of 11 U.S.C. § 541(c)(1)(B) (1988). The defendant's motion for summary judgment is denied.

IT IS SO ORDERED.