## In re AMERICANA EXPRESSWAYS, Debtor.

**Kenneth A. RUSHTON, Trustee, Plaintiff,**

**v.**

## SARATOGA FOREST PRODUCTS, INC., Defendant.

**United States of America on behalf of the Interstate Commerce Commission, Intervenor–Defendant.**

Bankruptcy No. 91–C–25142.
Adv. No. 93–PC–2391.
District Ct. No. 94–C–1171S.

United States District Court,
D. Utah,
Central Division.

Feb. 7, 1995.

---

Michael N. Zundel, Jardine, Linebaugh, Brown & Dunn, Salt Lake City, UT, for plaintiff.

E. Russell Vetter, Parsons Behle & Latimer; Kevin M. McDonough, Giaque, Crockett, Bendinger & Peterson; Russell C. Fericks, Richards, Brandt, Miller & Nelson, Salt Lake City, UT, Russell M. Allen, Allen, Fellows, Livingston, Greif, Sheridan, Ryan, Odman & Ford, Portland, OR, Daniel P. Price, Asst. U.S. Atty., U.S. Attorney's Office, Salt Lake City, UT, J. Christopher Kohn, Brendan Collins, Tracy J. Whitaker, U.S. Dept. of Justice, Civ. Div., and Henri F. Rush, Theodore Kalick and Virginia Strasser, Office of Gen. Counsel, I.C.C., Washington, DC, for defendant.

SAM, District Judge.

The United States of America on behalf of the Interstate Commerce Commission (ICC)

objects to an Order of the bankruptcy court, provisionally granting the trustee's motions for partial summary judgment in this and 14 related adversarial proceedings.[1] The bankruptcy court's Order adopted a Memorandum Opinion dated September 13, 1994, as its report and recommendation to the district court. *See* Bankruptcy Rule 9033 and Local District Court Bankruptcy Rule 407.

For reasons set forth more fully below, the district court declines to adopt the bankruptcy court's report and recommendation.

## I. Background

Common carriers were once required by the Interstate Commerce Act to charge shippers the tariff rates which the carriers filed with the ICC. 49 U.S.C. §§ 10761 & 10762. Under the "filed rate doctrine," the tariff rate was enforceable unless the ICC found the rate to be unreasonable. *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

Congress substantially deregulated the trucking industry when it enacted the Motor Carrier Act of 1980,[2] permitting carriers to negotiate lower rates with shippers and file their negotiated rates with the ICC. New trucking companies sprang up across the country, bidding down freight prices. However, some carriers failed to file the negotiated rates. When these carriers went bankrupt, their trustees in bankruptcy hired auditors to review past billings and identify which shippers had paid less than the filed rate.

After the shipments were delivered and paid for (sometimes years after), the trustees sued the shippers for "undercharges"—the difference between the negotiated rates and the filed rates. *See Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604 (1993).

The ICC adopted a policy that carriers who attempted to collect a filed rate after negotiating a lower rate, were engaging in an "unreasonable practice" and therefore could not enforce the filed rate. The Supreme Court disagreed in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court reiterated that the filed rate doctrine precludes any common law, equitable defenses to collection of the filed tariff—including the shipper's ignorance or the carrier's misquotation of rates. *Id.* at 126–28, 110 S.Ct. at 2765–67.

■ Nationwide, defunct motor carriers filed an estimated $200 million to $32 billion in undercharge claims. In response to this litigation crisis and the Supreme Court's decision in *Maislin,* Congress enacted the Negotiated Rates Act of 1993 (NRA).[3] Under the NRA, a shipper may not only contest the reasonableness of the filed rate, but may seek an ICC determination that the defunct carrier's conduct constitutes an "unreasonable practice" which estops the carrier from collecting its filed rate.[4] Alternatively, a shipper may satisfy certain undercharge

---

**1.** Various defendants join in the objection, including Pope & Talbot, Inc.; American Moulding & Millwork; Best Moulding Corporation; Blackline American Corporation; John Christy Trading Company, Inc.; Navajo National Council dba Navajo Forest Products, Inc.; Pacific Hide and Fur Depot; Ponderosa Products, Inc.; W. Silver, Inc.; Teton West Lumber Company; Carl Weissman & Sons, Inc.; Weyerhaeuser Company; Jasper Enterprises, Inc.; and Saratoga Forest Products, Inc.

**2.** Pub.L. 96–296 (July 1, 1980); *see* note to 49 U.S.C. § 10101, "Short Title of 1980 Amendments."

**3.** Pub.L. 103–180 (Dec. 3, 1993); *see* note to 49 U.S.C. § 10101, "Short Title of 1993 Amendments."

**4.** Thus, *Maislin* has been superseded by statute, as noted in such cases as *In re Jones Truck Lines, Inc.,* 860 F.Supp. 1360 (E.D.Wis.1994) and *Jones Truck Lines, Inc. v. Scott Fetzer Co.,* 860 F.Supp. 1370 (E.D.Ark.1994). *See Interstate Commerce Comm'n v. Transcon Lines,* —— U.S. ——, 115 S.Ct. 689, 130 L.Ed.2d 562 (1995) (applying *Maislin* and the filed rate doctrine to a case that arose before "recent Acts of Congress have made substantial changes in the regulation of interstate motor carriers").

claims by paying only a prescribed percentage.[5]

Congress later passed the Trucking Industry Regulatory Reform Act of 1994 (TIRRA),[6] largely eliminating the requirement that motor carriers file their rates. However, the TIRRA applies prospectively and does not "affect application of the Negotiated Rates Act of 1993 to undercharge claims for transportation provided prior to its enactment." Section 206(e).

The present case is typical of the nationwide litigation that arose following enactment of the Motor Carrier Act but prior to enactment of the TIRRA. The debtor, Americana Expressways (Americana), was a motor common and contract carrier operating in interstate commerce. Between 1986 and 1991, Americana negotiated rates with some of its shippers which were lower than its filed rates. Americana's financial condition suffered from the deregulation economy. In 1991 it filed a voluntary bankruptcy petition under Chapter 11. In 1993 its case was converted to Chapter 7, and Kenneth A. Rushton was appointed as trustee.

The trustee brought 147 adversary proceedings against shippers who were Americana's former customers, seeking $2,958,801.43 in freight undercharges.[7] Americana's undercharge claims are the primary asset of the bankruptcy estate. (Trustee's Response to United States' Objections to Recommended Order at 5.)

The trustee filed two motions for summary judgment which the bankruptcy court's Memorandum Opinion addressed. In his first motion, the trustee argued that the Negotiated Rates Act of 1993 (NRA) is *inapplicable* to a bankruptcy proceeding under the terms of § 9 of the NRA and the anti-forfeiture clauses of the Bankruptcy Code, 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B). In his second motion, the trustee argued that the NRA is *unconstitutional* because it violates the due process and equal protection clauses.

The bankruptcy court agreed that the NRA does not apply to the trustee's claims, considering the "plain meaning" of § 9. (Memorandum Opinion at 11.) Accordingly, the bankruptcy court did not need to reach the constitutional issues. Nevertheless, the court "found a serious doubt as to the constitutionality of the NRA" because the "retroactive destruction of the trustee's property rights" appeared to be an unlawful taking. *Id.* at 10.

## II. Discussion

### A. Standard of review

■ The district court is required to make a "de novo review" of any portion of the bankruptcy judge's conclusions of law to which specific written objection has been made. Bankruptcy Rule 9033(d).

### B. Whether the NRA applies in a bankruptcy proceeding

#### 1. Section 9 of the NRA

■ Section 9 of the NRA provides:

*Nothing in this Act* (including any amendment made by this Act) *shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy;* title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

*See* note to 49 U.S.C. § 10701, "Limitation on Statutory Construction" (emphasis added).

The bankruptcy court interpreted this provision "to mean that nothing in the NRA shall limit or affect the law of any bankruptcy proceeding." (Memorandum Opinion at 11.) "The intent of Section 9 is that ... application of the Bankruptcy Code must not

---

**5.** "Small business concerns" are wholly relieved from liability for certain undercharges claims. 49 U.S.C. § 10701(f)(9)(A).

**6.** Pub.L. 103–311, Title II (Aug. 26, 1994).

**7.** Many of these adversary proceedings have settled or otherwise been dismissed.

in any way be impacted by the enactment of the NRA." *Id.* at 10. The bankruptcy court was convinced that "[t]his reading of the language of the NRA comports with its plain meaning," even though only one case out of 40 decided since its enactment had held the NRA inapplicable to a bankruptcy proceeding. *Id.* at 11 & 3 n. 1. Accordingly, the court held that "the freight undercharge claims asserted by the trustee ... are unaffected by the provisions of the NRA." *Id.* at 12.

■ The starting point in every case involving statutory construction is the language of the statute itself. *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975)). However, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly,* 479 U.S. at 43, 107 S.Ct. at 357 (quoting *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986)).

Section 9 states that the NRA should not be "construed as limiting or otherwise affecting *application of title 11,*" the Bankruptcy Code. The bankruptcy court interpreted this language expansively to mean the NRA could not "limit or affect *the law of any bankruptcy proceeding.*" (Memorandum Opinion at 11; emphasis added.) Other courts have interpreted § 9 more narrowly:

Admittedly, the claim the Trustee is asserting ... is part of the debtor's estate in bankruptcy, but it is important to point out that it is a claim dependent entirely upon nonbankruptcy law. As one court has stated, the Trustee's "interest in the property must be determined by nonbankruptcy law because bankruptcy law does not create any property rights." [Citations omitted.] *The rights that the Trustee has as to its undercharge claim, as well as the defenses to which [the shipper] is entitled to assert, are governed by the ICA, as amended by the NRA, and not by the*

*Bankruptcy Code.* As such, the Court is not "limiting or otherwise affecting" the application of bankruptcy law in this case, since it is not necessary to apply the Bankruptcy Code to determine whether the Trustee is entitled to relief for its undercharge claim. *To hold otherwise, in effect, would be giving the Trustee interests in bankruptcy that the Debtor would not have outside of bankruptcy.*

*Brown Transport Truckload, Inc. v. Southern Wipers, Inc.,* 176 B.R. 82, 86 (Bankr. N.D.Ga.1994).

[I]n a narrow sense the NRA does not limit or affect the specific provisions of either title 11 or title 28 relating to bankruptcy law; rather, the NRA alters nonbankruptcy law found in title 49. This alteration has the effect of ... causing a cause of action to no longer be property of the bankruptcy estate under certain circumstances, but it does not specifically limit or affect the applications of title 11 or 28. *In other words, Section 9 may be construed to mean that the NRA does not repeal any provisions of title 11 or 28.*

*Jones Truck Lines, Inc. v. IXL Mfg. Co., Inc.,* 172 B.R. 602, 611 (Bankr.W.D.Ark. 1994).

The legislative history of the NRA makes it "abundantly clear that Congress intended to affect undercharge claims held by bankruptcy trustees." *In re Parker Refrigerated Serv., Inc.,* 173 B.R. 704, 715–16 (Bankr. W.D.Wash.1994). For example, a House committee report on H.R. 2121 (which became S. 412 and was passed as the NRA) explains:

The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates *brought about by trustees for non-operating motor carriers for past transportation services.*

H.R. 359, 103rd Cong., 1st Sess. (1993) at 7, 1993 U.S.C.C.A.N. at 2534 (emphasis added).

Accordingly, the vast majority of courts to consider the issue have concluded that the

NRA is applicable to a bankruptcy trustee's claims for freight undercharges. *E.g., North Penn Transfer, Inc. v. Stationers Distrib. Co.,* 174 B.R. 263 (N.D.Ill.1994); *Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.,* 174 B.R. 76, 80–81 and n. 9 (M.D.Tenn.1994); *Jones Truck Lines, Inc. v. Polyflex Film & Converting, Inc.,* 173 B.R. 576, 578–80 (S.D.Miss.1994); *Jones Truck Lines v. Madix Store Fixtures,* 1994 WL 416154 at 2–3 (N.D.Tex. April 6, 1994); and cases cited in *IXL,* 172 B.R. at 610.

This court agrees that § 9 should not be "construed to preclude the NRA's applicability in bankruptcy cases because to do so would produce an absurd result and be patently at odds with Congress's intent in enacting the NRA." *IXL,* 172 B.R. at 609–10.

### 2. Anti-forfeiture provisions of the Bankruptcy Code

 As the bankruptcy court noted, when a debtor files its petition in bankruptcy, its interests—both legal and equitable—generally become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). Property of the estate includes any causes of action which the debtor may have. 4 *Collier on Bankruptcy* § 541.01 at 541–45 (15th ed. 1993). Thus, Americana's claims for freight undercharges became property of its bankruptcy estate when it filed its petition in bankruptcy. *See In re Transcon Lines,* 147 B.R. 770, 772 (Bankr.C.D.Cal.1992).

 Property of a bankruptcy estate is protected by §§ 363(*l*), 541(c)(1)(B), which nullify any applicable law [8] that is "conditioned on the insolvency or financial condition of the debtor" and "effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such proper-

ty." The NRA is otherwise applicable law that effects a modification or termination of a motor carrier's interest in freight undercharge claims. The difficult question is whether relevant portions of the NRA are "conditioned on the insolvency or financial condition of the debtor." [9]

The bankruptcy court did not address this question but noted that one other case held the NRA inapplicable to a trustee's undercharge claims: *In re Bulldog Trucking, Inc.,* 173 B.R. 517 (W.D.N.C.1994). There, the bankruptcy court [10] reasoned that §§ 2(a)–(c) and (e)–(g) of the NRA are conditioned on the financial condition of the debtor because they apply only to a motor carrier that "is no longer transporting property, or is transporting property for the purpose of avoiding the application" of the NRA. [11] 173 B.R. at 535–36. *See also IXL,* 172 B.R. at 612.

Most courts that have considered this issue have disagreed:

> The operation of Section 2(a) turns on whether the carrier is still transporting property, whereas the operation of Section 5451(c)(1) depends on the financial status of the debtor. These two criteria are not the same.

*Aladdin Synergetics,* 174 B.R. at 81 n. 9. *See Stationers Distrib.,* 174 B.R. at 267; *North Penn Transfer, Inc. v. Polykote Corp.,* 170 B.R. 565, 567 (E.D.Pa.1994); *Scott Fetzer Co.,* 860 F.Supp. at 1375; *Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1305 (E.D.Ark.1994).

The distinction between "operating condition" and "financial condition" is not meaningless. While § 2(a) of the NRA might apply to the undercharge claims of a financially solvent carrier that has ceased operations, it did not apply to the undercharge

---

8. Section 541(c)(1)(B) refers to "applicable non-bankruptcy law"; section 363(*l*) refers to any "applicable law."

9. The NRA's exemption from liability for "small business concerns" depends on factors about the debtor other than its solvency, financial condi-

tion, or operating status. *In re Lifschultz Fast Freight Corp.,* 174 B.R. 271, 278 (N.D.Ill.1994).

10. The district court adopted a report and recommendation of the bankruptcy court.

11. Sections 2(a)–(c) and (e)–(g) are codified at 49 U.S.C. §§ 10701(f)(1)–(f)(3) and (f)(5)–(f)(7).

claims of a bankrupt carrier that was still transporting property under Chapter 11 of the Bankruptcy Code. *Gross Common Carrier v. A.B. Dick Co.*, 861 F.Supp. 638, 641 (N.D.Ill.1993).

On the other hand, whether a business has ongoing operations is certainly part of its financial condition. *IXL*, 172 B.R. at 612. "A business's financial condition is the broader concept which necessarily includes the operating or nonoperating status of that business. To say the operating status of a business is not a financial condition of the business is to ignore reality." *Id.*

█ Even if some meaningful distinctions can be drawn, the terms of the applicable law are not the decisive factor. The test is whether the law was intended to effect a forfeiture or penalty because of the debtor's bankruptcy or financial condition. *See In re Manning*, 831 F.2d 205, 210–11 (10th Cir. 1987).

Again, the legislative history clearly shows that the NRA was intended to remedy the "problem" created when a trucking company "went into bankruptcy and ceased operation, and trustees operating on behalf of the trucking company brought claims against the shipping business." 130 Cong.Rec. H9602 (quoted in *Bulldog*, 173 B.R. at 536).

Some courts have therefore recognized "the apparent conflict" between the anti-forfeiture provisions of the Bankruptcy Code and the NRA. *Jones Truck Lines v. Alliance Rubber Co.*, 166 B.R. 691, 693 (W.D.Ark.1994). Faced with this conflict, courts like *Bulldog* and *Jones* concluded that the anti-forfeiture provisions make the NRA unenforceable in bankruptcy proceedings. However, these courts ignore another legal canon.

"[T]he statute that is the more recent and specific, in this case the [NRA], usually controls the earlier and more general statute." *North Penn Transfer, Inc. v. Victaulic Co. of*

*America*, 859 F.Supp. 154, 161 n. 3 (E.D.Pa. 1994). As one bankruptcy court explained:

> *Since Congress intended the NRA to be applicable to these Defendants and § 2 of that Act conflicts with § 363(l) [of the Bankruptcy Code], one statute must give way. As the NRA is the more recent and more specific statute, it controls.... [T]he Code applies to the vast bulk of the national economy, while the NRA applies, for a limited time period, to a portion of the controversies in a particular regulated industry.* The same is true respecting the § 2 remedies, as compared to § 363(l).
>
> ... The NRA does not purport to amend the Code, but *to the extent of any conflict, the NRA displaces the Code in those limited situations to which it pertains.*

*Parker*, 173 B.R. at 716 (emphasis added).

This court agrees. Section 9 of the NRA should be interpreted to mean that the NRA does not repeal or amend the Bankruptcy Code. Nevertheless, in cases involving freight undercharges to which the NRA applies, the NRA displaces the Code to the extent of any conflict. To hold otherwise is to ignore the clear intent of Congress in enacting the NRA.

### C. Whether the NRA is unconstitutional

As noted previously, the Trustee argues that application of the NRA would violate the due process and equal protection [12] clauses. The bankruptcy court agreed that retroactive application of the NRA to this case suggests an unconstitutional taking.

█ To show that retroactive application of a statute violates the constitution, a party generally must assert an impact upon "vested" rights. *Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.*, 739 F.2d 1472, 1477 (10th Cir.1984). A cause of action is "inchoate and affords no definable or enforceable property right until reduced to fi-

12. Of course, the Fifth Amendment contains no equal protection clause. Any equal protection challenge to federal law rests on the due process clause of the Fifth Amendment.

nal judgment." *In re Consolidated U.S. Atmospheric Testing Litig.*, 616 F.Supp. 759, 766 (N.D.Cal.1985), *aff'd*, 820 F.2d 982 (9th Cir.1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988).

Thus, a claim for freight undercharges "does not involve the assertion of any vested right." *Lewis v. Squareshooter Candy Co.*, 176 B.R. 54, 56 (D.Kan.1994). The Supreme Court has "not hesitated to uphold legislation which has mooted pending lawsuits and destroyed accrued causes of action." *Taxpayers*, 739 F.2d at 1477. Indeed, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality" which can only be overcome by showing that "the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) (although *Turner Elkhorn* was a due process case, "it would be surprising indeed to discover now that ... Congress unconstitutionally had taken the assets of the employers there involved").

The legislative history of the NRA shows that Congress had a rational legislative purpose in enacting it. *Accord, Maislin Indus., U.S., Inc. v. Hollander Co.*, 176 B.R. 436 (Bankr.E.D.Mich.1995). The trustee has not presented evidence that would overcome the presumption of its constitutionality.

### III. Conclusion

The NRA is applicable to these adversary proceedings and is not unconstitutional. The district court therefore rejects the bankruptcy court's conclusions of law and recommits the matter to the bankruptcy court with directions to deny the Trustee's two motions for partial summary judgment.