**L. Lou ALLEN, Trustee on Behalf of the Bankruptcy Estate of TSC Express Co., Plaintiff,**

v.

**ITM, LTD. SOUTH, Defendant.**

**No. 2:93CV00271.**

United States District Court, M.D. North Carolina, Greensboro Division.

March 10, 1994.

**64**

Janine W. Dunn, Raleigh, NC, David G. Sperry, Law Offices, Independence, MS, for plaintiff L. Lou Allen.

Paul E. Marth, Forman, Marth, Black & Angle, P.A., Greensboro, NC, for defendant ITM, Ltd. South.

## MEMORANDUM OPINION

SHARP, United States Magistrate Judge.

This case is before the court on the motion of Defendant ITM, Ltd. South ("ITM") for summary judgment.[1] On November 23, 1993, this court ordered the action stayed pending resolution by the Interstate Commerce Commission ("ICC") of the reasonableness of TSC Express Company's ("TSC") filed shipping rates.[2] Shortly after this court stayed the litigation, on December 3, 1993, President Clinton signed into law the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (1993) ("Rates Act"), which ITM claims entitles it to summary judgment in the instant case.

For the reasons stated below, ITM's motion will be granted and judgment entered in its favor.

### BACKGROUND

The dispute in this case involves the proper tariff rate to be charged for transporting goods pursuant to the Interstate Commerce Act, 49 U.S.C. § 10701 *et seq.* (Supp.1993). In February of 1990, TSC agreed to charge Defendant ITM a discounted rate for transportation of ITM's freight. ITM paid in full the amount due under this agreement.

On or about May 14, 1991, TSC filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia. Pursuant to an order of the bankruptcy court, Plaintiff's freight bills were assigned to and assumed by Carrier Service, Inc. for the review, audit, and collection of any past due or underpaid freight bills. The audit consisted of a comparison between TSC's rates as set forth in tariffs on file with the ICC and the rates that were actually charged by TSC and paid by ITM and other shippers, the difference constituting the "undercharge." The audit indicated that TSC had undercharged ITM in the amount of $3,240.00.

Pursuant to 49 U.S.C. § 10761, the trustee of the bankruptcy estate of TSC brought this

---

1. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (1993).

2. Although ITM did not formally request that the stay of litigation be lifted, the court will treat ITM's summary judgment motion as implicitly including such a request.

suit to recover the amount ITM was undercharged. ITM counterclaimed, alleging that the filed rates were "unreasonable" within the meaning of section 10701(a) of the Act, 49 U.S.C. § 10701(a), and that ITM was entitled to the difference between the TSC's filed rate and the "reasonable rate" as determined by the ICC. This court stayed the litigation on November 23, 1993 to allow time for the parties to have the reasonableness of the filed rate determined by the ICC.

### DISCUSSION

■ In December 1993, the Rates Act was passed to combat a perceived inequity that results in some circumstances from the Supreme Court's decision in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). In *Maislin* the Court established unequivocally the "filed rate doctrine," under which a shipper is required to pay the tariff a motor common carrier has filed with the ICC, even when the shipper and carrier have negotiated a lower rate. *Maislin*, 497 U.S. at 126–28, 110 S.Ct. at 2765–67.

After the *Maislin* decision, many bankruptcy trustees, typified by Plaintiff L. Lou Allen in this case, brought suit to compel shippers to pay the difference between the rate they negotiated at the time of the transaction and the filed rate. Defendant shippers, like ITM, retained the defense of "unreasonableness" to challenge the filed rate before the ICC. With passage of the Rates Act, Congress added further weapons to the arsenal at shippers' disposal.

The Rates Act provides a mechanism whereby filed rate disputes may be settled according to a statutory formula. The Act also sets out specific exemptions from the collection of filed rates: small businesses, charitable organizations and recyclers. 49 U.S.C. § 10701(f)(9). ITM claims that it falls within the ambit of the small business exemption in section (f)(9)(A) of the Rates Act. That section provides as follows:

[A] person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—

(A) if such person qualifies as a small-business concern under the Small Business Act (15 U.S.C. 631 *et seq.*).

49 U.S.C. § 10701(f)(9)(A).

In turn, regulations of the Small Business Administration, issued pursuant to the authority of the Small Business Act, set out the requirements for businesses of various types to be considered "small businesses" within the meaning of the Act. 13 C.F.R. § 121.601 (1993). ITM is a North Carolina corporation engaged in the purchase and resale of used textile machinery.[3] Under section 121.601, a business of this type with gross sales of less than $3.5 million is considered a "small business." 13 C.F.R. § 121.601.

In support of its motion for summary judgment, ITM has submitted the uncontested affidavit of Jo Van der Linden, Vice President of ITM. He states that during 1990, the year of the shipment in question, ITM's gross sales totaled $3,444,688, an amount qualifying ITM as a "small business" as described above. Mr. Van der Linden also attaches ITM's 1990 income tax return, which reflects the same sales figure.

In response to ITM's motion for summary judgment, Plaintiff does not contest ITM's factual showings. Plaintiff contends simply that the Rates Act is inapplicable to any motor carrier that, like TSC, is a debtor under the Bankruptcy Code. 11 U.S.C. § 101 *et seq.* (1993). Plaintiff alleges that section 541(c)(1) of the Bankruptcy Code "explicitly prevents otherwise applicable nonbankruptcy laws, like the [Rates Act], from causing a forfeiture of the debtor's property based on the debtor's insolvency or financial condition," and that Plaintiff's undercharge claim falls within this provision.

Section 541(c)(1) provides as follows:

---

**3.** This information was not provided by ITM in connection with its motion for summary judgment; it is taken from the affidavit of Jo Van der Linden filed in conjunction with ITM's response to TSC's previous motion for summary judgment. Because the court is considering a motion for summary judgment, it may examine the entire record for relevant material.

[A]n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an ... applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1). Plaintiff appears to argue that the Rates Act's jurisdictional provision, 49 U.S.C. § 10701(f)(1), contravenes section 541(c)(1) of the Bankruptcy Act. Section (f)(1) of the Rates Act provides that when an undercharge claim is made by a motor carrier or its representative, the party against whom the undercharge claim is made may elect to satisfy it according to the settlement provisions of the Act "upon showing that—(A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection...."' 49 U.S.C. § 10701(f)(1). Section nine of the Rates Act states that nothing in it shall be construed as limiting or otherwise affecting application of the Bankruptcy Code.

■ The question before the court is whether the Rates Act constitutes a "nonbankruptcy law" that is "conditioned on the insolvency or financial condition of the debtor," and that effects a forfeiture, modification, or termination of the debtor's interest in property. The court holds that it does not. The Rates Act is not conditioned on the insolvency or financial condition of the carrier. It applies to carriers "no longer transporting property" or those who are transporting property merely to avoid the effects of the statute. A carrier that closes down operations for *any reason*, without regard to financial condition, would be subject to the Rates Act, not merely those carriers that become insolvent.

The conclusion drawn above becomes unavoidable when the legislative history of the Rates Act is considered. Congress intended to preserve for shippers the benefit of the bargain that they secured when contracting with a carrier that is no longer in operation. Further, Congress was especially concerned with the effect that the collection of undercharges could have on small businesses. One of the many strong statements in favor of the Rates Act was given by Representative Shuster:

Quite simply, the undercharge crisis has been caused by certain trustees of bankrupt trucking companies repudiating the trucking company's own rates for past transportation services, and then trying to benefit from this unseemly conduct in a bankruptcy proceeding.

I would like to give you an example of what has been happening to thousands of American companies and why so many feel so injured and outraged about this issue. I am sure that every single one of you has stacks of letters in your offices with stories every bit as shocking as the one I'm about to describe.

A small wholesale mom-and-pop carpet distributor with only six employees shipped carpet at a rate of 16 cents per yard—exactly the price they had agreed upon with the trucking firm hired to deliver it. The carpet was delivered, they paid the bill. End of story. Right?

Wrong. Two years later the trucker went bankrupt and the trustee who was appointed for the firm found a higher charge for the shipment—a lot higher. This small firm, the kind that makes up the backbone of the American economy, was sued for $16,892 in undercharges for one small shipment. That made the freight charge $32 per yard for carpet that costs $1.79 to $6.99 per yard at the retail level. That amounts to more than a 20,000-percent increase.

139 Cong.Rec. H9596 (daily ed. Nov. 15, 1993). Without question, the Negotiated Rates Act of 1993 was intended by Congress to address precisely the case that is now before the court.

■ It is a basic rule of statutory construction that when a statute directs that it be applied to all pending cases, courts "have no choice but to follow its dictates." *United States v. 1002.35 Acres of Land,* 942 F.2d 733, 736 (10th Cir.1991). The Rates Act, in section 2(c), provides that it "shall apply to all claims pending as of the date of the enactment of this Act...." Since this case

was pending on December 7, 1993, the Rates Act, according to its terms, will apply to it. Because Congress has so specifically tailored the Rates Act to cases such as this one, the court need not analyze the Act's effects on Plaintiff's antecedent property rights. *See Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 622, 11 L.Ed.2d 576 (1964) ("[A] retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'") (footnote omitted) (quoting *Union Pac. R. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 [1913]).

Because the Rates Act applies to Plaintiff's pending case and exempts ITM as a "small business," judgment for Defendant is mandated.

## CONCLUSION

For the reasons set out above, Defendant's motion for summary judgment is **GRANTED.** Accordingly, a Judgment dismissing this action will be entered contemporaneously with this Memorandum Opinion.