In re MAISLIN INDUSTRIES, U.S., INC., et al., Debtor.

Stuart GOLD, Trustee, Plaintiff,

v.

A.J. HOLLANDER COMPANY, et al., Defendant.

Bankruptcy Nos. 83–03161–R, 85–0076–R.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Jan. 19, 1995.

**437**

*SUPPLEMENTAL OPINION* [1]

STEVEN W. RHODES, Bankruptcy Judge.

On July 29, 1986, this Court referred these adversary proceedings to the Interstate Commerce Commission ["I.C.C."] for a determination as to whether the assessment of rates claimed by the plaintiff constituted an unreasonable practice or whether the rates themselves were unreasonable in violation of 49 U.S.C. § 10701(a). Now, the defendants in these adversary proceedings seek to have this Court amend the I.C.C. referral to include issues raised by the Negotiated Rates Act of 1993 ["NRA"], Pub.L. 103–180, 107 Stat. 2044, enacted into law December 7, 1993.

On July 5, 1994, a hearing on these matters was held in open court. This Court determined that certain provisions of the NRA were applicable to the defendants, and therefore granted the defendants' motion to amend the referral to include consideration of the NRA.

### I.

The United States Supreme Court in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), held that the Interstate Commerce Act forbids the secret negotiation and collection of rates lower than the rate the carrier filed with the I.C.C. Accordingly, the Court ruled that collection of the filed rate could not be barred as an unreasonable practice where the parties had negotiated an unfiled rate. Although this decision abolished the defendants' principal defense, they asserted that other defenses were still available. Accordingly, on April 15, 1991, this Court again referred these adversary proceedings to the I.C.C. for consideration of the defendants' claims of rate unreasonableness. On December 3, 1993, the NRA was enacted into law.[2] On December 23, 1993, the I.C.C. reopened these proceedings to determine

Richard Fellrath, Detroit, MI, Thomas Auchincloss, Washington, DC, for plaintiff.

Julia Caroff, U.S. Attys. Office, Detroit, MI, for U.S.

John Bryant, Detroit, MI, Robert Schuler, Troy, MI, Peter Greene, Washington, DC, James Baiers, Detroit, MI, for defendant.

Virginia Strasser, Interstate Commerce Com'n, Washington, DC, for I.C.C.

1. This opinion supplements an opinion given in open court on July 5, 1994.

2. Congress enacted the NRA in response to the many suits filed by bankruptcy trustees to compel shippers to pay the difference between the rate they negotiated and the rate filed with the I.C.C. The NRA sets forth a mechanism whereby filed rate disputes may be settled according to a statutory formula.

whether Maislin's rates were unreasonable. To date, however, the I.C.C. has not yet decided this issue.

On March 15, 1994, the defendants filed the motion currently before this Court. The defendants seek to amend this Court's referral order to include issues under the NRA. The defendants claim that the NRA creates defenses which were not present at the time of the 1991 referral order.[3] The trustee and plaintiff in these adversary proceedings, Stuart Gold, objects to the defendants' request for an amended referral order. One objection raised by the trustee is that the NRA, as applied to these proceedings, is unconstitutional. The defendants assert that the NRA is constitutional.

Because the constitutionality of an act of Congress was called into question, this Court, pursuant to 28 U.S.C. § 2403, sent the United States Attorney General a certification of intervention. The United States has intervened, as a matter of right, and supports the defendants' position.

## II.

### A.

The trustee asserts four justifications for not amending the referral to the I.C.C. First, the trustee contends that the NRA is inapplicable to bankruptcy proceedings. He argues that section 9 of the NRA explicitly provides that the NRA shall not limit or otherwise affect application of 11 U.S.C. §§ 541(a) or 704. If the NRA is applied to the present adversary proceedings, section 2(a) of the act would limit the estate's property to only 5, 15 or 20 percent of the claim. Moreover, if the I.C.C. were to find that the rates were unreasonable, section 2(e) would eliminate any claim. The trustee asserts that these provisions would clearly limit the application of § 541(a) by reducing the prop-

erty of the estate and correspondingly limit § 704. The trustee concedes that it may have been the original intent of the Public Works Committee of Congress to apply this law against debtors; however, political pressures forced a compromise and ultimately a different legislative result.

Second, the trustee asserts that section 2(e) does not apply to pending claims, but only to prospective claims. The trustee states that because the new prohibition applies to conduct which was previously lawful, there is a presumption of prospective application rebuttable only by explicit language to the contrary.

Third, the trustee argues that retroactive application would violate the Equal Protection Clause of the United States Constitution. The trustee argues that the NRA singles out a class of persons and retroactively subjects them to different treatment from all others who possess identical rights. Also, section 2(e) of the NRA employs a cut-off date of September 30, 1990, so that collection efforts for transportation performed prior to that date are unlawful. The trustee argues that this is a readjustment of property rights of private persons and is in essence an unlawful taking.

Finally, the trustee asserts that the NRA violates the separation of powers doctrine under the United States Constitution. He contends that Congress, through the NRA, has usurped the power of the judiciary by asserting the power to annul a judgment of the courts. If this Court amends the referral of this matter to the I.C.C., the trustee argues that this Court would in effect give the I.C.C. the right to annul or overturn a final decision rendered by the United States Supreme Court. Such an action, the trustee contends, would violate the separation of powers doctrine.

---

3. Specifically, the defendants contend that section 2(e) of the NRA creates an alternative procedure for resolving disputes resulting from attempts of a motor carrier or its representatives to assess undercharges for transportation services provided before September 30, 1990.

Second, the defendants state that section 2(f) of the NRA allows settlement of actions such as the present cases by payment of either fifteen (15) or twenty (20) percent of the difference

between the tariff rate and the originally billed rate, depending on the weight of the individual shipments.

Finally, the defendants assert that section 2(a) of the NRA exempts persons qualifying as small business concerns from liability for the difference between rates originally billed and the applicable and effective tariff rates of carriers such as Maislin.

**439**

B.

The defendants argue that under section 2(e)(2) of the NRA, the I.C.C. has jurisdiction to determine the issue of unreasonable rate practices as encompassed by section 2(e), and therefore this Court should amend its referral to include the broadened jurisdiction of the I.C.C.

Moreover, the defendants contend that referral encompassing the NRA should be granted to the I.C.C. so that they may present evidence and argument to the I.C.C. concerning exemptions or settlement options under section 2(a) of the NRA and the newly enacted 49 U.S.C. § 10701(f).

Finally, the defendants state that at pages 4–5 of its December 21, 1993 decision, the I.C.C. indicated that it should determine the threshold issue of whether shipments allegedly affected by 49 U.S.C. § 10701(f)(2), (3), or (9) fall within the general negotiated rates context described in 49 U.S.C. § 10701(f)(1). Therefore, the defendants argue that the proper forum to make a determination as to whether the NRA applies to these proceedings is, by the I.C.C.'s own admission, the I.C.C.

The defendants contest the trustee's argument that the NRA is inapplicable to debtors in bankruptcy. The defendants state that the NRA applies to all carriers "no longer transporting property," or "transporting property for the purpose of avoiding" the NRA. The defendants aver that the legislative history clearly reveals the congressional intent to have the NRA apply to debtors in bankruptcy. Moreover, the defendants argue that the NRA conditions its effect upon the operating, rather than the financial status of the carrier, and therefore is not affected by the limitations found in 11 U.S.C. § 541(c)(1).

C.

The United States supports the defendants' position that remedial provisions of the NRA are applicable to these adversary proceedings and should be considered by the I.C.C. pursuant to an amended referral. The United States asserts that section 2(a) of the NRA allows shippers faced with undercharge claims to elect to satisfy such claims by paying a percentage of the amount claimed. This provision, the United States contends, is applicable to *any* claims pending on December 3, 1993, or arising from shipments tendered within two years after that date. Moreover, the United States argues that for any disputes over shipments tendered before September 30, 1990, the NRA allows shippers to prove to the I.C.C. that a carrier's collection of undercharges was an unreasonable practice, thereby overruling the United States Supreme Court case of *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

Regarding section 9 of the NRA, the United States argues that this language is only relevant in cases where the NRA is inconsistent with the Bankruptcy Code. If this Court construes section 9 to mean that the NRA is inapplicable to carriers in bankruptcy, the United States argues that such a decision would invalidate the very core of the NRA—that is, the shipper relief provisions of sections 2(a) and (e). The United States submits that further evidence of the NRA's applicability to bankrupt carriers can be found in its application to carriers "no longer transporting property." If Congress intended the NRA not to apply to bankrupt carriers, the United States asserts that it would have included limiting language in this provision.

With respect to the constitutional challenges, the United States argues that the trustee's Fifth Amendment challenge must fail because Congress acted rationally and with a legitimate legislative purpose in enacting the NRA. Further, the United States asserts that the NRA does not violate the separation of powers doctrine. The United States points out that Congress is free to alter judicial interpretations of statutory enactments by passing new legislation or modifying current legislation.

III.

In matters of statutory construction, the duty of this Court is to give effect to the intent of Congress, and in doing so, the Court's first reference is to the literal mean-

ing of the words employed in the statute. *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980); *Flora v. United States*, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Therefore, this Court must first look to the plain language of the NRA to determine its applicability to debtors in bankruptcy. If the language is clear and unambiguous, then this Court need not look to the statute's legislative history. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). This Court should construe the NRA's language "so as to give effect to the intent of Congress." *See United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

## IV.

The first issue before the Court is whether section 9 of the NRA prohibits its application to debtors in bankruptcy by contravening the anti-forfeiture provision in 11 U.S.C. § 541(c)(1). Section 9, "Limitation on Statutory Construction," defines the NRA's applicability to bankruptcy proceedings. That provision states:

> Nothing in this Act ... shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United

States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

Section 9 unambiguously provides that the Bankruptcy Code governs notwithstanding the NRA. However, the trustee argues that there is a potential conflict between the NRA and the Bankruptcy Code. The trustee argues that the NRA is inapplicable to these proceedings because the NRA would "limit or otherwise affect" application of the Code's anti-forfeiture provision, 11 U.S.C. § 541(c)(1).[4]

The anti-forfeiture provision of the Bankruptcy Code operates to prevent the transfer of what would otherwise be estate assets by voiding any third-party attempt to strip the debtors of assets.[5] That section provides, in pertinent part:

> [A]n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an ... applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.[6]

11 U.S.C. § 541(c)(1)(B). The issue then becomes whether the NRA's applicability to these proceedings is "conditioned on the insolvency or financial condition" of Maislin.

It is interesting and important to note the legislative history behind the enactment of the NRA.[7] The NRA was created after years of lobbying by shipper groups and the

---

**4.** Section 2(a) of the NRA would affect the anti-forfeiture provision of the Code by mandating that carriers, here Maislin, accept settlements ranging from 5 to 20 percent for claims against the defendants; thereby limiting recovery for the estate.

**5.** Courts have recognized that undercharge claims constitute property of the estate as defined in 11 U.S.C. § 541. *See Maislin Indus., U.S., Inc. v. A.J. Hollander Co.*, 69 B.R. 771 (E.D.Mich.1986); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir.1990); *Cooper v. ICC* (*In re Bulldog Trucking, Inc.*), 150 B.R. 912 (W.D.N.C.1992); and *Gumport v. ICC* (*In re Transcon Lines*), 147 B.R. 770 (Bankr.C.D.Cal. 1992).

**6.** Bankruptcy courts have consistently enforced § 541(c)(1) with great vigor. *See In re Government Sec. Corp.*, 972 F.2d 328 (11th Cir.1992) (§ 541(c)(1) rendered unenforceable an insurance policy provision that terminated the policy based on the appointment of a 'receiver or other liquidator' for the insured); *In re Railway Reorganization Estate, Inc.*, 133 B.R. 578 (Bankr. D.Del.1991) (§ 541(c)(1) rendered unenforceable clauses which purported to terminate, limit or otherwise modify a debtor's interest in its property upon the filing of a bankruptcy petition).

**7.** Summarizing the purpose of the NRA, Senator Danforth, a leading sponsor of the legislation, stated:

> Mr. President, today we finally bring to an end an expensive nuisance for America's busi-

I.C.C. In early 1993, the Senate passed an undercharge relief bill, S. 412.[8] During the same time, the House held hearings on another undercharge relief bill, H.R. 2121[9], which was proposed by Representative Norman Mineta, chairman of the House Committee on Public Works and Transportation. During the House Surface Transportation Subcommittee meeting on H.R. 2121, sponsors of the bill added a new provision, which eventually became section 9 of the NRA. The trustee argues that section 9 was a last minute decision by the House to exclude all bankruptcy cases from the new requirements of the NRA.[10]

The United States and the defendants argue that letters between Representative Brooks and Representative Mineta represent the concern over jurisdiction, not a decision to exclude bankruptcy cases from application of the NRA. Legislative history supporting the position of the United States and the defendants is provided in a statement made to the House by Representative Mineta:

> [W]e are clarifying in section 9 of this bill that we do not intend in this legislation to affect either the bankruptcy code or the jurisdiction of the bankruptcy courts, matters over which our committee does not have jurisdiction. At present, when a car-

---

nesses that has resulted from the continued enforcement of outdated laws....

The Motor Carrier Act of 1980 substantially deregulated the trucking industry by eliminating most price and entry requirements. One significant regulation retained was the requirement that trucking companies filed with the ICC all tariffs governing shipments. Since enactment of the 1980 Act, however, carriers have frequently negotiated lower rates with shippers but have not filed those rates with the ICC. In 1990, the Supreme Court in *Maislin Industries v. Primary Steel*, held that shippers are required to pay the filed rate when the shipper and carrier have privately negotiated a lower rate, regardless of the equities involved. The trustees of bankrupt trucking companies that had negotiated such rates are now suing shippers for the difference. These suits are being brought years after payment for and delivery of the shipments.

Let me use a hypothetical to illustrate the absurdity of this situation.... you bought a discount airline ticket from Pan Am several years ago for $300. Subsequently, Pan Am liquidates. Pan Am's bankruptcy trustee notifies you that the nondiscounted price of the ticket you purchased was $600. The trustee says that Pan Am was supposed to file the discounted ticket price, $300, with a government agency, but [it] failed to do so. Thus, Pan Am's trustee says that you owe the difference between the agreed upon price and nondiscounted fare....

The legislation also preserves a shipper's right to pursue an ICC determination of the reasonableness of the rate charged, if a shipper elects not to use the settlement formulas. It also eliminates lawsuits that bankruptcy trustees have brought to collect money from shippers related to code and range tariffs.

139 Cong.Rec. S16183–01 (daily ed. Nov. 18, 1993) (statement of Sen. Danforth) (citations omitted).

**8.** The Senate Report on the bill stated that its purpose was to alleviate the "freight motor carri-

er 'undercharge' litigation crisis" and resolve disputes "resulting from efforts by trustees for bankrupt motor carriers or nonhousehold goods forwarders to collect additional amounts for past transportation provided, in certain instances where the agreed-upon rate or charge allegedly was not properly or timely filed in a tariff with the ICC...." S.Rep. No. 79, 103d Cong., 1st Sess. 1 (1993).

**9.** H.R. 2121, *The Negotiated Rates Act of 1993*, H.R.Rep. No. 359, 103d Cong., 1st Sess. 7 (Nov. 15, 1993), U.S.Code Cong. & Admin.News 1993, p. 2534. H.R. 2121 ultimately became the NRA, with some revisions.

**10.** According to an article in the *ABI Journal*, the purpose of section 9 was to forestall any attempt by Jack Brooks, chairman of the House Committee on the Judiciary, to assert jurisdiction over the bill. Mr. Brooks also insisted that an exchange of letters be placed on the Report of the Committee on Public Works and Transportation on the NRA to memorialize that the NRA was not intended to affect either the Bankruptcy Code or title 28. Joseph L. Steinfeld, Jr., *The Negotiated Rates Act of 1993: Did Congress Sidestep the Bankruptcy Code's Anti-forfeiture Provisions?*, ABI Journal, Vol. XIII, No. 5, June 1994, at 34.

A letter written by Representative Mineta to Representative Brooks regarding section 9 was submitted into record:

> Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, *I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects [sic] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts.* Based on our agreement, it is my understanding that you will not pursue your request for a sequential referral.

H.R.Rep. No. 359, at 16, U.S.Code Cong. & Admin.News 1993, p. 2543.

rier is in bankruptcy, and when in the course of the bankruptcy proceeding an issue arises over which the ICC has particular expertise, the court typically refers that issue to the ICC pursuant to the doctrine of primary jurisdiction. The ICC decides that particular issue, and the ICC's decision is then incorporated by the court into the overall adjudication of the bankruptcy case. Nothing in this legislation would alter the current statutory framework which established the respective jurisdictions of the courts and the ICC.

139 Cong.Rec. H9603 (daily ed. Nov. 15, 1993) (statement of Rep. Mineta, Chairman of the Public Works and Transportation Committee). Representative Brooks reinforced this interpretation of section 9 by stating the following:

[T]he Committee on the Judiciary had earlier expressed concern that H.R. 2121, the Negotiated Rates Act of 1993, as ordered reported by the Committee on Public Works and Transportation, could have been construed to limit the jurisdiction of the Federal courts, including the bankruptcy courts. However, ... Mr. Mineta has offered an amendment to section 9 of H.R. 2121 clarifying that nothing in the proposed act shall be construed to limit or otherwise affect the jurisdiction of the Federal courts to make determinations in bankruptcy cases and proceedings.

139 Cong.Rec. H9603 (statement of Rep. Brooks, Chairman of the Committee on the Judiciary).

Moreover, the early legislative history of the NRA indicates that it was to be made applicable to carriers in bankruptcy. The Senate Report stated the purpose of the bill:

The bill, as reported, is intended to alleviate the freight motor carrier "under-

charge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by trustees for bankrupt motor carriers ... to collect additional amounts for past transportation provided....

S.Rep. No. 79, 103d Cong., 1st Sess. 1 (1993).

The House Report, in which bill H.R. 2121 was substituted with the text of the Senate Bill and amended, stated a similar purpose for enacting the NRA:

The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates brought about by trustees for non-operating motor carriers for past transportation services.

H.R.Rep. No. 359, 103d Cong., 1st Sess. 7, *reprinted in* 1993 U.S.C.C.A.N. 2534, 2534.

Since the passage of the NRA, only a few courts have ruled in favor of the trustee's position. *See Cooper v. E.I. du Pont de Nemours & Co. (In re Bulldog Trucking, Inc.)*, 173 B.R. 517 (Bankr.W.D.N.C.1994).[11]

Conversely, there have been several decisions rejecting the trustee's analysis. *See Hoarty v. Midwest Carriers Corp. (In re Best Refrigerated Express, Inc.)*, 168 B.R. 978 (Bankr.D.Neb.1994); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F.Supp. 1296 (E.D.Ark.1994); *Allen v. ITM, Ltd. South*, 167 B.R. 63 (M.D.N.C.1994); *Hoarty v. Bennett Trans., Inc. (In re Best Refrigerated Express, Inc.)*, 170 B.R. 158 (Bankr.D.Neb. 1994); *Jones Truck Lines, Inc. v. Asco Hardware, Inc.*, LR–C–93–459, 1994 WL 261005 (E.D.Ark., March 8, 1994); *Gumport v. Sterling Press (In re Transcon Lines)*, No. CV–94–1248–IH (C.D.Cal., March 22, 1994).[12] *See also* Wayne Johnson, *The Nego-*

---

**11.** Cases supporting the trustee's position decided after this opinion was rendered include *Jones Truck Lines Inc. v. IXL Mfg. Co., Inc. (In re Jones Truck Lines)*, 172 B.R. 602, 611 (Bankr.W.D.Ark. 1994) ("Section 9 does not render the NRA inapplicable in bankruptcy cases ... [however] the provisions of the NRA are unenforceable in a bankruptcy case because of the anti-forfeiture provisions of 11 U.S.C. § 541(c)(1)(B) (1988).") and *Rushton v. Saratoga Forest Prods., Inc. (In re Americana Expressways, Inc.)*, 172 B.R. 99, 103 (Bankr.D.Utah 1994) ("This court interprets

[Section 9] to mean that nothing in the NRA shall limit or affect the law of any bankruptcy proceeding.").

**12.** Cases rejecting the trustee's position decided after the Court's July 5, 1994 opinion include *North Penn. Transfer, Inc. v. Victaulic Co. of America*, 859 F.Supp. 154 (E.D.Pa.1994) and *Beyer v. Bend Millworks (In re Parker Refrigerated Serv., Inc.)*, 173 B.R. 704 (Bankr.W.D.Wash. 1994).

tiated Rates Act of 1993, 68 Am.Bankr.L.J. 319, 389–95 (Summer 1994).

The courts which have held that the NRA does not contravene the anti-forfeiture clause of § 541(c)(1) have concluded that the application of the NRA is not conditioned on insolvency or the financial condition of the carrier. Rather, these courts have interpreted the language that the NRA applies only to carriers "no longer transporting property" to mean carriers that have terminated operations for *any reason*, without regard to financial condition. *Allen v. ITM, Ltd. South*, 167 B.R. at 66 ("The Rates Act is not conditioned on the insolvency or financial condition of the carrier. It applies to carriers 'no longer transporting property' or those who are transporting property merely to avoid the effects of the statute."); *Hoarty v. Midwest Carriers Corp.*, 168 B.R. at 985 ("[T]he 'no longer transporting property' clause does not constitute the equivalent of a clause terminating the debtor's interest in property based upon the 'financial condition' of the debtor. It is not the financial condition of the carrier that triggers the termination of the property interest, it is the retroactive application of the NRA that terminates the property interest." [13]). Further, these courts have looked to the legislative history behind the NRA, and have found that Congress intended to preserve for shippers the benefit of the bargain they secured when contracting with a carrier that is no longer in operation. *Allen v. ITM, Ltd. South*, 167 B.R. at 66.

■ Considering the plain language of the statute, this Court must agree with the majority of courts which have determined that the NRA's application is not conditioned upon a carrier's insolvent financial condition. Rather, as the statute clearly states, the NRA's application is conditioned only upon the carrier no longer transporting property.

Because financial status is not a prerequisite to the NRA's application, it is not in violation of § 541(c)(1).

## V.

The second issue before the Court is whether section 2(e) applies only to prospective, not pending, claims. The trustee argues that the settlement provisions of section 2(e) do not apply to these proceedings because there is no "express command" that section 2(e) is to apply to pending cases.

Section 2(c) of the NRA provides that the settlement provisions found in subsections 2(b) and (c) "shall apply to all claims pending as of the date of the enactment of this Act...." Strictly interpreted, because the matters presently before the Court were pending as of December 7, 1993, the date the NRA was enacted, those provisions of the NRA are undisputably applicable.

■ The trustee's argument, however, is that the rate unreasonableness determination addressed in section 2(e) is not applicable to these proceedings because that section is not specifically enumerated in section 2(c) as applying to all claims pending as of the date of enactment of the NRA. The trustee's argument is partially correct, as section 2(e) does not apply to claims pending as of December 7, 1993. Rather, section 2(e) provides:

[I]t shall be an unreasonable practice for a motor carrier of property ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a tariff ... and the negotiated rate for such transportation service....

Again, a plain reading of this provision clearly sets forth its applicability to charges for transportation provided before September

---

13. The court supported its holding by providing two examples of how the NRA would apply to carriers 'no longer transporting property' in and out of bankruptcy. The court notes that if a carrier ceases operations, but does not file bankruptcy, the 'no longer transporting' property clause under Section 2(A) would still apply and the carrier would be unable to pursue its undercharge claim. However, the Bankruptcy Code would not apply to the nonbankrupt, non-operating carrier. Therefore, the financial condition of the carrier would not be a factor in applying section 2(A). Conversely, if a carrier files Chapter 11, deciding in good faith to continue operations, it would not lose its undercharge claim by virtue of section 2(A). In this scenario, the financial condition of the carrier does not terminate or modify the carrier's right to continue to pursue undercharge claims, and the carrier has identical property rights under the NRA as a nonbankrupt motor carrier. *Hoarty v. Midwest Carriers, Corp.*, 168 B.R. at 985.

30, 1990.[14] Because the charges in these adversary proceedings were for transportation services rendered prior to September 30, 1990, the referral to the I.C.C. should be amended to include consideration of the issues provided for under section 2(e).

### VI.

The third issue before the Court is whether retroactive application of the NRA would violate the Equal Protection Clause of the Fifth Amendment to the United States Constitution. The trustee argues that the NRA constitutes a taking under the Fifth Amendment because the estate's property right, the cause of action for an undercharge claim, has been reduced and/or eliminated by the retroactive application of the NRA.

■ The modern approach taken by courts regarding commerce power of Congress is to give extreme deference to a conclusion by Congress that it has authority under the Commerce Clause to enact a particular regulation where there is a rational basis for the regulation and when the purpose of the regulation is to achieve a legitimate end. Retroactive legislation that adjusts the burdens and benefits of economic life is presumed constitutional, and it is the trustee's burden to show that the NRA is arbitrary and serves no rational legislative purpose. See Costantino v. TRW, Inc., 13 F.3d 969, 976 (6th Cir.1994).

[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.

Id. (quoting Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 729–30, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984)).

■ The legislative history of the NRA provides a sound basis for the conclusion that Congress' enactment of the NRA was not arbitrary, and indeed served a rational legislative purpose—halting the outrageous litigation costs of bankruptcy trustees pursuing undercharge claims in carrier cases. The NRA seeks to resolve an on-going crisis involving billions of dollars in undercharge claims by debtor motor carriers. Congress found that this crisis has had a negative impact on interstate commerce. H.R.Rep. No. 359, at 8.

Moreover, in United States v. Security Indus. Bank, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), the Supreme Court held that Congress may pass a law which retroactively eliminates property rights, if the statute explicitly states that it applies retroactively. Accordingly, this Court will not discuss whether the NRA constitutes a taking under the Fifth Amendment and will presume that the statute is constitutional because Congress has explicitly stated that the NRA applies retroactively.

Moreover, the Court finds that the trustee has failed to show how the NRA is arbitrary and serves no rational legislative purpose. The extensive legislative history of the NRA clearly demonstrates otherwise.

### VII.

Finally, the trustee contends that Congress, by overturning the Supreme Court's decision in Maislin and enacting the NRA, violated the separation of powers doctrine of the United States Constitution.

■ Although in a general way the Constitution provides that each of the three branches of government should be free from control by the others, the Constitution does provide for a checks and balance control. Under this division of authority, Congress is empowered to overrule any Supreme Court decision, other than one turning upon an interpretation of a constitutional provision, by enacting legislation. See, e.g., Patterson v. McLean Credit

14. September 30, 1990 was chosen as a cut-off date for remedies under section 2(e) because Congress felt that until the Supreme Court's decision in Maislin was widely disseminated, "it was clearly understood that it was the bankrupt carrier that precipitated the situation by failing to file a negotiated rate as they had agreed to do." H.R.Rep. No. 359, at 10, U.S.Code Cong. & Admin.News 1993, p. 2537.

 

*Union,* 491 U.S. 164, 172–73, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). In fact, the Supreme Court in *Maislin* recognized Congress' ability to legislatively overrule its decision.

> If strict adherence to §§ 10761 and 10762 as embodied in the filed rate doctrine has become an anachronism in the wake of the MCA, it is the responsibility of Congress to modify or eliminate these sections.

*Maislin,* 497 U.S. at 135–36, 110 S.Ct. at 2771.

Accordingly, Congress' actions in drafting and enacting legislation overturning the *Maislin* decision is not in violation of the Separation of Powers Doctrine. The trustee's argument is without merit and if adopted by this Court, would prohibit Congress from enacting remedial legislation and regulating interstate commerce.

### VIII.

In conclusion, the Court holds:

First, section 9 of the NRA does not contravene the anti-forfeiture provision of 11 U.S.C. § 541(c)(1), because section 9 does not condition its applicability on the financial condition of the carrier.

Second, section 2(e) of the NRA specifically provides that it applies to any charges for transportation services rendered before September 30, 1990. Therefore, this provision applies to the claims presently before the Court.

Third, the Court finds that the NRA is constitutional because the trustee has failed to show how the NRA is arbitrary and irrational.

Finally, enactment of the NRA does not violate the separation of powers doctrine as provided for in the United States Constitution. Through its legislative power, Congress can overturn or modify any United States Supreme Court decision, other than one turning on an interpretation of a constitutional provision.

Therefore, this Court concludes that it should amend its referral to the I.C.C. to include any and all applicable issues under the NRA.