In re AMERICANA EXPRESSWAYS,
INC., Debtor.

Kenneth A. RUSHTON, Trustee, Plaintiff,

v.

SARATOGA FOREST PRODUCTS,
INC., Defendant.

Bankruptcy No. 91C–25142.
Adv. No. 93PC–2391.

United States Bankruptcy Court,
D. Utah.

Sept. 12, 1994.

Michael N. Zundel, Jeffery J. Devashray-ee, Jardine, Linebaugh, Brown & Dunn, Salt Lake City, UT, Joseph L. Steinfeld, Jr., Sims, Walker and Steinfeld, P.C., Washington, DC, Richard G. Wilkins, Professor of Law, Brigham Young University, Provo, UT, for Kenneth A. Rushton, Trustee, plaintiff.

E. Russell Vetter, Parsons Behle & Latimer, Salt Lake City, UT, for Saratoga Forest Products, Inc.

Brendan Collins, Civil Div., Dept. of Justice, Washington, DC, for Dept. of Justice.

Theodore Kalick, ICC, Washington, DC, for ICC.

Kevin M. McDonough, Giauque Crockett Bendinger & Peterson, Salt Lake City, UT, for Pope & Talbot.

Russell C. Fericks, Richards, Brandt, Miller & Nelson, Salt Lake City, UT, for numerous shipping defendants.

## MEMORANDUM OPINION

GLEN E. CLARK, Chief Judge.

On May 10, 1994, and July 12, 1994, the court heard two motions for summary judgment brought by the trustee. The trustee challenges the applicability of the Negotiated Rates Act of 1993 ("NRA") as well as the constitutionality of the NRA itself. The court took the matters under advisement and now issues the following opinion.

### FACTS

Americana Expressways ("Americana") was a motor common and contract carrier operating in interstate commerce pursuant to authority issued by the Interstate Commerce Commission ("ICC"). From time to time between 1986 and 1991, Americana charged its customers rates which were lower than its published tariff rates. On August 9, 1991, it filed a voluntary petition in this court under Chapter 11. On February 13, 1993, the case was converted to Chapter 7 and Kenneth A. Rushton was appointed to serve as trustee. The trustee has brought numerous adversary proceedings seeking the difference between the rates charged and the filed rates which were in effect at the time of shipment. This difference has been characterized as freight undercharge claims. They were all commenced prior to the enactment of the NRA.

### THE ISSUE

In his first motion for summary judgment, the trustee takes the position that Section 9 of the NRA specifically prevents the application of its provisions to any entity which has sought protection under the Bankruptcy Code. He further argues that the anti-forfeiture clauses found in 11 U.S.C. § 541 and 11 U.S.C. § 363 are a shield against enforcement of the NRA.[1] The trustee's second motion for summary judgment argues that the NRA violates the Fifth Amendment Due Process Clause and the Fourteenth Amendment Equal Protection Clause of the Constitution.

### ANALYSIS

■ The history and purpose of the filed rate doctrine (see 49 U.S.C. § 10101, et seq.) are recounted in some detail in the Supreme Court's opinion in *Maslin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The filed rate doctrine requires common carriers, whose rates are regulated by the ICC, to collect the difference between the rate the carrier actually charged shippers and the rate filed with the Interstate Commerce Commission. This requirement prevailed notwithstanding the fact that the rate actually charged the shippers (the "negotiated rate") was an otherwise enforceable contract between the carrier and the shipper.

The genesis of these freight undercharges was the Motor–Carrier Act of 1980[2] and the ICC's establishment of a "Negotiated Rates" policy that departed from the filed rate doctrine and instead encouraged the proliferation of secret negotiated rates contrary to the Interstate Commerce Act (*Maslin,* 497 U.S. at 130, 110 S.Ct. at 2768). This had the effect of deregulating the trucking industry. Upon deregulation, numerous trucking companies sprang up across the country. These new trucking companies, in a competitive

---

1. Since the enactment of the NRA approximately 40 opinions have been written concerning the applicability of the NRA to a bankruptcy proceeding. Only one case *Bulldog Trucking Inc. v. E.I. DuPont De Nemours & Co.,* 173 B.R. 517 (Bankr.W.D.N.C.1994) holds that the NRA does not apply to a bankruptcy proceeding. Thirty-nine of the opinions hold that the NRA is applicable to a bankruptcy proceeding.

2. Nothing in the Motor–Carrier Act of 1980 repealed or put into question the requirement that a carrier provide services at any rate other than the rate filed with the ICC.

effort to obtain their share of the market, competitively bid down prices. As a result, the "negotiated rates" fell far below the filed rates.

Subsequently, a significant number of trucking companies sought bankruptcy protection. Many of the trustees appointed to administer these debtor companies have brought suit against the shippers to collect the difference between the negotiated rate and the filed rate, the freight undercharge. The Supreme Court in *Maslin* upheld the trustee's right to seek these undercharges. In so doing, the Court rejected the ICC's attempt, by rule-making, to preclude carriers from bringing suit under the filed rate doctrine as an unreasonable practice contrary to 49 U.S.C. § 10701. Later, the Supreme Court in *Reiter v. Cooper,* 507 U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), held the procedural rules governing counterclaims apply to the shippers "unreasonable rate" defense raised in response to a trustee's filed rate doctrine law suit. It further determined that it was not necessary for the shipper to first pay the filed rate and later, based on an unreasonable rate theory, seek a determination of its damages with the ICC.

■ Because the trustee has challenged the constitutionality of the NRA, this court will approach the issues as did the United States Supreme Court in *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978), wherein the Court stated the "cardinal principle that this court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided." Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). "When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). Accordingly, if the court finds that the constitutionality of the NRA has been put into question, the court must then ascertain whether a construction of the NRA is fairly possible by which the constitutional question may be avoided.

### THE CONSTITUTIONAL CHALLENGE

■ The trustee argues that the NRA impermissibly takes Americana's property without just compensation. While admitting that the task of distinguishing an impermissible governmental taking from permissible governmental action is a problem of considerable difficulty, the United States Supreme Court has identified three factors that have particular significance in determining whether an impermissible taking has occurred. They are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with the distinct investment-backed expectations; and (3) the character of the governmental action. *Penn. Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

#### *Economic Impact:*

The trustee seeks to recover over 2.9 million dollars in freight undercharge claims from the defendant and other shippers. These claims constitute the primary asset of the Americana estate. If the terms of the NRA apply to this estate, the trustee will be prevented from collecting the vast bulk of the estate's claims. Accordingly, the economic impact of the NRA on the estate is substantial and potentially devastating to the estate.

#### *Investment–Backed Expectations:*

The defendant argues that the trustee can have no legitimate investment-backed expectations because the negotiated rate and not the filed rate should control. The defendant's argument is without merit. During the period in question, the Interstate Commerce Act has been in full force and effect. The Act does not permit either a shipper's ignorance or the carrier's misquotation of the applicable rate to serve as a defense to collection of the filed rate. 49 U.S.C.A. §§ 11902–11904. *See Maslin* 497 U.S. at 120, 110 S.Ct. at 2762–63; *Southern Pacific Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982); *Louisville and Nash-*

*ville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). The trustee, as the representative of the creditors and equity security holders of this debtor, is entrusted with the duty to collect and reduce to money all property of the bankruptcy estate. 11 U.S.C. § 704(1).[3] This duty is an affirmative duty which has caused the trustee and his professionals to invest considerable time, money and resources in reliance on the well-settled law surrounding the Interstate Commerce Act and the filed rate doctrine. *See Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *Texas & Pacific R. Co. v. Mugg,* 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011 (1906); *Gulf, C. & S.F.R. Co. v. Hefley,* 158 U.S. 98, 15 S.Ct. 802, 39 L.Ed. 910 (1895). Perhaps the most powerful indication that a trustee and his professionals are to rely on the filed rate doctrine in expending their time and resources to collect under-charge claims can be found in the Supreme Court's ruling in *Security Services, Inc. v. K Mart Corp.,* —— U.S. ——, ——, 114 S.Ct. 1702, 1710, 128 L.Ed.2d 433 (1994), which states that "[t]rustees in bankruptcy and debtors in possession may rely on the filed rate doctrine to collect for undercharges, *Maslin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116 [110 S.Ct. 2759, 111 L.Ed.2d 94] (1990) ..." This ruling of the United States Supreme Court was announced on May 16, 1994, a full five months after the NRA was enacted into law. The trustee and his professionals, acting in behalf of the creditors, have invested heavily in behalf of the estate and have a genuine investment-backed expectation.

The trustee, as the representative of all the creditors of the estate, is vested with the investment-backed expectations of the creditors. The creditors of this estate extended credit to Americana based upon their own investment-backed expectations. Creditors expected debtor to collect and shippers to pay the filed rates.[4] As the representative of all creditors in the estate, the trustee stands in the shoes of the creditors and is endowed with the same investment-backed expectations that each individual creditor could advance. 11 U.S.C. § 544(a)(1).

*The Character of the Governmental Action:*

The governmental action in enacting the NRA can be characterized as an effort to deal with a problem faced by the motor carrier industry that originated with and has been exacerbated by one of the government's own agencies, the ICC. Had the ICC not chosen to adopt a negotiated rates policy that directly conflicts with its own governing statute,[5] there would most likely be few freight undercharge claims to collect and Americana may not be a debtor in bankruptcy court today. Now, the NRA proposes to place the burden of the ICC's misdirected policies on the shoulders of the creditors of this estate, the trustee and his professionals. The character of the governmental action is substantial and more similar to the complete taking of all legal rights as opposed to a simple "regulation." The rights affected by the NRA are best described as contractual rights governed by federal statute. While a number of cases deal with constitutional challenges of this nature, *Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) and *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) best parallel the economic impact, the extent of

3. In fact, the trustee's failure to enforce collection of the filed rate could subject the trustee to civil or criminal sanctions of up to $20,000.00 and/or imprisonment for not more than two years. 49 U.S.C. § 11903(a).

4. The defendant shipper argues that to pay the difference between the filed rate and the negotiated rate will be economically ruinous to them. If, in fact, the shipper is only required to pay the freight undercharge to the trustee, the shipper may be getting off easy. 49 U.S.C. § 11902

provides that a shipper who knowingly receives a rebate or offset against the filed rate is liable to the government for a civil penalty in an amount equal to three times the rebate. 49 U.S.C. § 11903 provides for a fine of at least $1,000.00 but not more than $20,000.00 and/or imprisonment for not more than two years for knowingly accepting or receiving service at less than the filed rate.

5. See *Maslin,* 497 U.S. at 134–35, 110 S.Ct. at 2770–71.

interference with investment-backed expectations and the character of the government action involved with this matter. In *Hodel,* the constitutionality of the Indian Land Consolidation Act of 1983 was challenged. The act divested individual indians of their right to devise or bequeath interests in lands that, pursuant to federal statute, were allotted to individual indians, held in trust by the government and administered by the Secretary of the Interior. The Court, in finding that an unconstitutional taking had occurred, ruled that the character of the government action was extraordinary because it virtually abrogated the right.

In *Lynch,* 292 U.S. 571, 54 S.Ct. 840, the Court found that the Economy Act of 1933 violated the takings clause of the Fifth Amendment where it sought to repeal all laws granting or pertaining to yearly renewable term insurance. Although the renewable term policies were contracts of the United States, arising out of and governed by federal statute, the Court ruled that the contracts were property that created vested rights and that "[t]o abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *Lynch,* 292 U.S. at 580, 54 S.Ct. at 844.

The retroactive destruction of the trustee's property rights by the NRA creates a similar taking and, therefore, this court finds a serious doubt as to the constitutionality of the NRA.

Having found a serious doubt as to the constitutionality of the NRA, the court is now required to determine, as a matter of statutory construction, if the NRA can be construed so as to avoid the constitutional question. *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982).

### STATUTORY CONSTRUCTION

The trustee argues that a fair reading of the statute makes the NRA inapplicable to the trustee by virtue of the language found in Section 9 of the NRA. This section reads as follows:

> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

The language in Section 9 includes reference to both Title 28 and Title 11. The intent of Section 9 is that the jurisdiction of the bankruptcy courts must not in any way be impacted by the enactment of the NRA and that application of the Bankruptcy Code must not in any way be impacted by the enactment of the NRA.

■ The trustee argues that the freight undercharge claims are a property of the estate and that, as property of the bankruptcy estate, the undercharge claims should not be limited or otherwise affected by the NRA. The commencement of a case in bankruptcy creates an estate which is comprised of all of the debtor's interests both legal and equitable, wherever located and by whomever held. The debtor's causes of action to recover freight undercharges fall within the scope of 11 U.S.C. § 541(a) and constitute property of the debtor's estate. *In re Transcon Lines,* 147 B.R. 770 (Bankr.C.D.Cal.1992) *citing In re Crysen/Montenay Energy Co.,* 902 F.2d 1098 (2nd Cir.1990); *see also* 4 COLLIER ON BANKRUPTCY § 541.01 at 541–5 (15th ed. 1993) (property of the debtor's estate under 11 U.S.C. § 541 includes the debtor's causes of action).

■ Property of the estate is measured at the time of commencement of the case. The property rights of the estate are defined by bankruptcy law at the commencement of the case and remain the law of the case unless expressly changed by Congress. Here, Congress made it clear that the NRA would not limit or otherwise affect application of Title 11 of the United States Code. This court interprets that language to mean that nothing in the NRA shall limit or affect the law of any bankruptcy proceeding. This reading of the language of the NRA comports with its plain meaning and avoids the asserted constitutional challenges.

## CONCLUSION

Accordingly, this court holds that the freight undercharge claims asserted by the trustee in the Americana Expressways, Inc. bankruptcy case are unaffected by the provisions of the NRA.