In re KMC TRANSPORT, INC., Debtor.

C. Barry ZIMMERMAN,
Trustee, Plaintiff,

v.

FILLER KING COMPANY, Defendant.

Bankruptcy No. 92–01488.
Adv. No. 93–6236.

United States Bankruptcy Court,
D. Idaho.

Feb. 27, 1995.

Kenneth R. Arment, Boise, ID, for plaintiff.

Terry L. Myers, Givens Pursley & Huntley, Boise, ID, for defendant.

## MEMORANDUM OF DECISION

ALFRED C. HAGAN, Bankruptcy Judge.

Presently before the Court is defendant Filler King Company's motion to dismiss and defendant's motion for sanctions, costs and an award of attorney's fees under Federal Rule of Bankruptcy Procedure 9011 and 28 U.S.C. § 1927.

### BACKGROUND

KMC Transport, Inc. (the "Debtor") filed its petition for relief under chapter 7 of Title 11 of the United States Code on May 7, 1992. The Debtor was a motor common carrier operating in interstate commerce under the authority of the Interstate Commerce Commission ("ICC"). Filler King Company ("Filler King") is a freight customer of the Debtor. Barry Zimmerman ("Trustee") is the duly appointed chapter 7 trustee.

On August 11, 1993, this Court authorized the Trustee's hiring of PASCO/Interstate

Audit Company to audit the Debtor's freight bill for the purpose of determining whether these freight bills had been properly rated according to the tariffs filed with the ICC by the Debtor. The result of the audit showed $14,431.15 in undercharges made by the Debtor to Filler King between May 1989 and August 1991.

Pursuant to the Interstate Commerce Act ("ICA"), the Trustee seeks recovery of undercharges. Filler King contends it is a "small business concern" within the meaning of the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (1993) (the "NRA") and therefore has a complete defense to the Trustee's undercharge claims. The Trustee does not contest Filler King's status as small business.[1] Instead, the Trustee contends either the NRA does not apply in bankruptcy proceedings or in the alternative that the NRA is unconstitutional.

### DISCUSSION

The Trustee contends the NRA is not applicable in this proceeding because: (1) 11 U.S.C. § 541(c)(1)(B) and 363($l$) make the NRA ineffective in bankruptcy proceedings; (2) retroactive application of the NRA would result in a violation of the Fifth Amendment; and (3) the NRA violated the separation of powers granted to the judiciary.

### A. Historical Background

■ The ICC regulates interstate commerce of common carriers to insure that rates are both reasonable and nondiscriminatory. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 119, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990). To that end:

Federal regulations require all common carriers to file tariffs with the ICC, in which the carrier publishes the rates it will charge its customers. 19 U.S.C. § 10101 *et seq.* Carriers may not charge or receive a rate that they have not published in a filed tariff. 49 U.S.C. § 10761(a). As a result, a shipper may recover any amounts

that a carrier has charged it over and above the filed tariff. *Brizendine v. Cotter & Co.*, 4 F.3d 457, 460 (7th Cir.1993). Likewise, a carrier may recover any "undercharge," that is, the difference between a rate actually charged and a higher filed rate. *Madler v. Artoe*, 494 F.2d 323, 326 (7th Cir.1974). These rules comprise the so-called "filed rate doctrine." *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990).

*Allen v. Spiegel, Inc.*, 169 B.R. 394, 395 (N.D.Ill.1994).

The Supreme Court described the justification for the filed rate doctrine as follows:

This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. *See* S.Rep. No. 46, 49th Cong., 1st Sess., 181, 188–190, 198–200 (1886). As the Commission itself found: "[P]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates." *Poor v. Chicago, B. & Q.R. Co.*, 12 I.C.C. 418, 421–422 (1907).

*Maislin*, 497 U.S. at 127–28, 110 S.Ct. at 2766.

In 1980, Congress passed the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980) which to some extent deregulated the trucking industry. The deregulation caused a great number of new motor carriers to enter the industry which in turn depressed shipping rates:

In many cases, however, carriers failed to file tariffs with the ICC to reflect the discounted rates negotiated with shippers. Such rates frequently remained unfilled, despite the fact that the 1980 MCA contin-

---

1. In his Memorandum in Opposition to the Defendant's Motion to Dismiss, the Trustee contends that Filler King has not presented evidence sufficient to demonstrate that it is a "small business concern." However, the Trustee's attorney later conceded that Filler King is a "small business concern."

ued ... requirement under the ICA that motor common carriers file tariff rates with the ICC and that these traffics would be applicable to all shippers seeking similar transportation movements. *Jones Truck Lines, Inc. v. IXL Manufacturing Company, Inc. (In re Jones Truck Lines, Inc.),* 172 B.R. 602, 608 (Bankr.W.D.Ark. 1994).

The lower shipping rates caused by the Motor Carrier Act of 1980 also caused many motor carriers to file petitions for relief under the bankruptcy code. In the wake of these bankruptcies, many court appointed trustees sued the shippers for "undercharges" claiming that rates charged for specified shipments before had been below the tariff filed by the debtor with the ICC. *In re Jones Truck Lines, Inc.,* 172 B.R. at 608.

In response, the ICC modified its interpretation of the filed rates doctrine to allow the defense of waiver based on carrier rate misquotation. *In re Jones Truck Lines, Inc.,* 172 B.R. at 606. The Eleventh Circuit Court of Appeals and the Eighth Circuit Court of Appeals held the ICC had the authority to modify the filed rate doctrine by expanding the defense of "unreasonable practices" provided by 49 U.S.C. § 10704(a). *Seaboard Sys. R.R., Inc. v. United States,* 794 F.2d 635 (11th Cir.1986); and *Maislin Industries, U.S., v. Primary Steel, Inc.,* 879 F.2d 400, 405 (8th Cir.1989), *rev'd, Maislin,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Thereafter, shippers who found themselves being sued for undercharges by a bankrupt carrier "routinely asserted the defense that the carrier's or the trustee's attempt to collect these undercharges constitutes an 'unreasonable practice.'" *de Medici v. FDSI Management Group (In re Lifschultz Fast Freight Corp.),* 174 B.R. 271, 275 (N.D.Ill. 1994). This defense became known as the "negotiated rates doctrine." *Id.*

This state of affairs continued until 1990, when the Supreme Court reversed the Eighth Circuit Court of Appeals and held the "negotiated rate doctrine" contravened the ICA and was therefore invalid. *Maislin,* 497 U.S. 116, 130, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990).[2] In reliance on *Maislin,* the bankruptcy trustees continued to sue shippers for undercharges.

In 1993, Congress passed the NRA in direct response to the Supreme Court's decision in *Maislin.*

> [T]he basic reason for Congress' passage of the NRA was to address the problem that trustees for bankrupt carriers were pressing businesses all across the country for payments on shipments made years before.... In the hearings of the House Subcommittee on Surface Transportation on this legislation, there was extensive discussion of the problems caused by undercharge claims asserted by trustees of bankrupt motor carriers....

*Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1299 (E.D.Ark. WD 1994).

■ The NRA provides shippers with several defenses to claims for undercharges brought pursuant to the filed rates doctrine under certain circumstances.[3] The first defense created by the NRA directly reverses the *Maislin* decision. Section 2(e) of the NRA provides that if the carrier has ceased operations, "it shall be an unreasonable practice for a motor carrier ... to charge for a transportation service provided before September 30, 1990, the difference between the [filed] rate and the negotiated rate." Thus shippers who relied on the pre-*Maislin* circuit and ICC law are protected from the retroactive effect of *In re Maislin.* However, the shipper must provide written evidence of the negotiated rate. NRA § 2(e)(6).

■ The second group of defenses created by the NRA allows shippers to settle undercharge claims brought by "non-operating carriers" for 20%, 15% or 5% of the undercharge claim depending upon the weight of

**2.** But later, in *Reiter v. Cooper,* — U.S. —, —, 113 S.Ct. 1213, 1217, 122 L.Ed.2d 604 (1993), the Supreme Court ruled that shippers may assert that the filed rates themselves are unreasonable. As a matter of procedure, the Court permitted shippers to raise a counterclaim for recoupment of an amount equal to the

undercharge, thus asserting that the negotiated rate was an unreasonable one.

**3.** These defenses are codified at 49 U.S.C. § 10701(f).

the shipment and whether the shipper is a "public warehousemen." NRA § 2(a) The shipper's right to settle is optional; but if the shipper elects to settle, the carrier is bound by the shipper's decision. These defenses apply to all undercharge claims pending on the date of enactment (October 1993) of the NRA and to all claims arising out of shipments tendered before the second anniversary of the enactment of the NRA.[4] Only those claims settled or finally adjudicated prior to the passage of the NRA are unaffected.[5]

█ The third set of defenses provided by the NRA, apply regardless of whether the carrier is operating or non-operating. NRA § 2(a)[6] provides small businesses concerns, charitable organizations and shippers of recyclable goods with an absolute defense for all undercharge claims for the difference between the rates "billed and paid" and the rates filed. Like the settlement procedures these defenses also expire on December 3, 1995.

Following the enactment of the NRA, chapter 7 trustees have filed numerous adversary proceedings in bankruptcy courts for undercharges contending that the NRA is either unconstitutional or that the NRA does not apply in bankruptcy proceedings. The present case is part of this third waive of undercharge litigation.

4. NRA § 2(c).

5. NRA §§ 2(f) and (g).

6. Codified at 49 U.S.C. § 10701(f)(9).

7. (f) **Procedures for resolving claims involving unfilled, negotiated transportation rates.**—

   (1) **In general**—When a claim is made by a motor carrier of property (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title, by a freight forwarder (other than a household goods freight forwarder), or by a party representing such a carrier or freight forwarder regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier or freight forwarder for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—

**B. Section 541(c) and 363(l )**

The Trustee contends the NRA small business defense claimed by the defendant violates section 541(c)(1)(B) and 363(l ) of the Bankruptcy Code. Section 541(c)(1)(B) provides:

   (c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

   . . . .

   (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B).

The defenses set forth in 49 U.S.C. §§ 10701(f)(2), (3), and (4) are conditioned on the debtor being a "non-operating carrier." 49 U.S.C. § 10701(f)(1)[7] The Trustee con-

   (A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; and
   (B) with respect to the claim—
   (i) the person was offered a transportation rate by the carrier or freight forwarder other than that legally on file with the Commission for the transportation service;
   (ii) the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;
   (iii) the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;
   (iv) such transportation rate was billed and collected by the carrier or freight forwarder; and
   (v) the carrier or freight forwarder demands additional payment of a higher rate filed in a tariff.
   If there is a dispute as to the showing under subparagraph (A), such dispute shall be re-

tends "non-operating carrier" is equivalent to the "financial condition of the debtor," and therefore section 541(c) prevents application of the NRA in bankruptcy proceedings. A few of the bankruptcy courts have concluded that Code sections 541(c) and 363(*l*) prohibit the application of these defenses.[8] But the majority and the better reasoned cases have concluded that the application of 49 U.S.C. § 10701(f) does not result in a forfeiture prohibited by Code sections 541(c) or 363(*l*).[9]

■ However, we need not determine whether the "non-operating carrier condition" is a forfeiture protected by section 541(c) and 363(*l*) because the "small business" exception provided by § 10701(f)(9)[10] asserted by the defendant here is not contingent upon whether the carrier is operating or not.

Section 10701(f)(1)(A) states that a party must show that a carrier is no longer transporting property, if that party wishes to satisfy his claim under paragraphs (2), (3) and (4). A reference to paragraph (9), the small business concern paragraph, is noticeably missing from Section 10701(f)(1). However, Section 10701(f)(7) states that *"Except as authorized in paragraphs (2), (3), (4), and (9) of this subsection,"* nothing relieves a motor common carrier from filing its rates, complying with the law, and complying with ICC rules. 49 U.S.C. § 10701(f)(7) (emphasis added).

It is apparent from a comparison of the two subsections discussed above that Congress does not intend for the courts to consider the "no longer transporting property" requirement under Section 10701(f)(1)(A), when evaluating a shipper/brokers "small business concern" defense under Section 10701(f)(9). Had Congress intended the "no longer transporting property" clause of (f)(1)(A) to apply to (f)(9), the small business concern paragraph, it would have listed paragraph (9) with (2), (3) and (4) under Section 10107(f)(1), as it did under 10701(f)(7). A court should not read a paragraph into a statutory section when Congress has left the paragraph out. Section 10701(f)(9) states that if movant qualifies as a "small-business concern," . . . it is excused from being liable . . . for the undercharge claim. The "small business concern" exemption stands on its own, without reference to the operating or non-operating status of the carrier.

*Hoarty v. Midwest Carriers Corporation (In re Best Refrigerated Express, Inc.),* 168 B.R. 978, 984–85 (Bankr.D.Neb.1994). *See also In re Lifschultz,* 174 B.R. 271, 278 (N.D.Ill. 1994); *Jones Truck Lines, Inc., v. Polyflex*

solved by the court in which the claim is brought. If there is a dispute as to the showing under subparagraph (B), such dispute shall be resolved by the Commission. Pending the resolution of any such dispute, the person shall not have to pay any additional compensation to the carrier or freight forwarder. Satisfaction of the claim under paragraph (2), (3), or (4) of this subsection shall be binding on the parties, and the parties shall not be subject to chapter 119 of this title.

. . . .

49 U.S.C. § 10701(f)(1).

**8.** *Cooper v. E.I. Du Pont de Nemours (In re Bulldog Trucking, Inc.),* 173 B.R. 517, 533–41 (W.D.N.C.1994) (due to the anti-forfeiture provisions of sections 541(c) and 363(*l*) of the Bankruptcy Code, the NRA could not be applied to the trustee's undercharge claim); *E.I. Du Pont de Nemours and Co. v. Cooper (In re Du Pont de Nemours & Co.),* 173 B.R. 550, 570 (W.D.N.C. 1994); *Jones Truck Lines, Inc. v. IXL Manufacturing Company,* 172 B.R. at 612 ("The fact that the forfeiture provision is not literally conditioned on the filing of a bankruptcy petition or the debtor's financial condition does not exempt it from the

terms of the anti-forfeiture provision of title 11, where the precise reason for the forfeiture is, in fact, the condition of the debtor.").

**9.** *Beyer v. Bend Millworks (In re Parker Refrigerated Service, Inc.),* 173 B.R. 704, 716 (Bankr. W.D.Wash.1994) (see additional cases cited at page 711); *Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.,* 174 B.R. 76, 80–81 (M.D.Tenn. 1994); *North Penn Transfer v. Stationers Distributing Co.,* 174 B.R. 263, 267–68 (N.D.Ill.1994) (see additional cases cited at page 267).

**10.** (9) **Claims involving small-business concerns, charitable organization, and recyclable materials.**—Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—

(A) if such person qualifies as a small-business concern under the Small Business Act (15 U.S.C. 631 *et seq.*),. . . .

49 U.S.C. § 10701(f)(9)(A).

*Film & Converting, Inc.,* 173 B.R. 576, 580 (S.D.Miss.1994); *North Penn Transfer, Inc. v. Polykote Corp.,* 170 B.R. 565, 567 (E.D.Pa. 1994). Therefore, the Trustee's contention that the condition set forth in 49 U.S.C. § 10701(f)(1)(A) is violative of Bankruptcy Code section 541(c) and 363(*l*) is irrelevant to Filler King's small business defense.

## C. Separation of Powers

The trustee contends that because the NRA in effect reverses *In re Maislin* decision, the NRA violates the constitutional doctrine of separation of powers.

> Our system of Federal government vests in the Congress the legislative power, and in the Article III courts the judicial power. The Constitution makes this allocation of powers explicit, and there is nothing equivocal in its language.

*Plaut v. Spendthrift Farm, Inc.,* 1 F.3d 1487, 1499 (6th Cir.1993), *cert. granted in part,* —— U.S. ——, 114 S.Ct. 2161, 128 L.Ed.2d 885 (1994).

Consequently,

> Where Congress disagrees with the manner in which the judiciary has interpreted a statute, it may amend the statute so as to effect the proper congressional intent, and thus render the faulty judicial interpretation moot. But Congress may not require the Federal courts to nullify or vacate their properly rendered judgments, regardless of what injustice Congress believes those judgments have visited upon private parties.

*Id.,* 1 F.3d at 1499.

> [However], [t]he principle that Congress may impose new legal rules applicable in pending cases was recognized by the Supreme Court almost two hundred years ago in *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).... Congress is free to make changes in the law applicable to pending civil cases....

*Berning v. A.G. Edwards & Sons, Inc.,* 990 F.2d 272, 277 (7th Cir.1993).

■ Although the NRA does amend the ICA so as to reverse the *Maislin* decision it does not reverse the *Maislin* judgment. For

purposes of separation of powers, a judgment is "final" and the case is no longer "pending" only after a judgment is rendered and "the availability of appeal [is] exhausted, and the time for petition for certiorari [has] elapsed or a petition for certiorari finally [has been] denied." *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1571 (9th Cir.1993), quoting, *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987). Consequently, the NRA does not violate the Separation of Powers.

Further, even if the NRA's reversal of *In re Maislin* violates the Separation of Powers, the portion of the NRA at issue here, i.e. section 2(a) does not reverse *Maislin* Court's decision to overturn the negotiated rates doctrine. Rather the section at issue here, creates a whole new defense for certain entities including small business.

## D. The Fifth Amendment Substantive Due Process

The trustee contends that the defenses granted to shippers under the NRA are a violation of Fifth Amendment substantive due process and implied equal protection because they treat non-operating carriers differently from operating carriers. However, the defense at issue here, the small business concern exception, is not dependant upon whether the carrier is operating or not. Consequently, whether the "operating carrier" versus "non-operating carrier" distinction violates either the Due Process Clause or the Equal Protection Clause need not be determined.

## E. Fifth Amendment "Taking"

■ One bankruptcy court has concluded that the defenses created by the NRA constitute an unconstitutional Fifth Amendment taking without compensation. *See Rushton v. Saratoga Forest Products, Inc. (In re Americana Expressways, Inc.),* 172 B.R. 99, 101–02 (Bankr.D.Utah 1994). The *Americana Expressways,* court relied on the Supreme Court's decision in *Penn Central Transportation Company v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978):

[I]t will be useful to review the factors that have shaped the jurisprudence of the Fifth Amendment injunction "nor shall private property be taken for public use, without just compensation." The question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the "Fifth Amendment's guarantee ... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. *See Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)....

In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. *See Goldblatt v. Hempstead, supra*, 369 U.S., at 594, 82 S.Ct., at 990. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e.g., United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978).

Applying the *Penn Central* factors, the *Americana Expressways, Inc.*, court concluded there is a "serious doubt as to the constitutionality of the NRA." *Americana Expressways*, 99 B.R. at 103. The court then held, if possible it was required to interpret the NRA so as to avoid the constitutional question. *Id.* The court then concluded the "operating carrier" vs. "non-operating carrier" distinction violated 11 U.S.C. § 541(a) and therefore, the NRA defenses were not available in bankruptcy proceedings. *Id.* 99 B.R. at 103–04.

However, as the "non-operating carrier" requirement is not at issue in the present case the constitutional issue cannot be avoided by the holding NRA § 9 and Bankruptcy Code § 541(a) prohibit application of the small business defense to cases in bankruptcy. Accordingly, the constitutional issue raised by the trustee must be addressed.

This is not a situation in which the interference with property can be characterized as a physical invasion by government. Rather, this is a case when interference arises from a public program adjusting the benefits and burdens of economic life to promote the common good.

Motor common-carriage is a highly regulated industry. The ICC requires that common carriers charge all shippers comparable rates. Congress and the ICC created the filed rates doctrine to insure that common carriers treat all shippers alike. The filed rate doctrine was created to protect shippers not common carriers. However, the filed rates doctrine can lead to harsh results when unsuspecting shippers act upon lower negotiated rates. In 1989 the courts of appeal and the ICC used the negotiated rates doctrine to prohibit the collection of undercharges resulting from the difference between the filed rate and the negotiated rate. In 1990 the Supreme Court reversed the courts of appeal and held the negotiated rates doctrine was contrary to the ICA. In 1993 the Supreme Court reinstated a modified version of the negotiated rates doctrine. *See footnote 2 supra.* It is against this background that Congress passed the NRA.

Given the highly regulatory nature of undercharge claims and the fact that the ability to claim undercharges has come and gone several times in recent years, a debtor could not have had any real expectation that the

ability to collect undercharges would continue in the future.

Essentially, what Congress has done is to modify the method of enforcing the filed rates requirement, a requirement imposed for the benefit of shippers.

Accordingly, the NRA does not result in a unconstitutional taking in the present situation.

### F. Defendant's Motion For Costs and Attorney's Fees

■ Pursuant to Federal Rule of Bankruptcy Procedure 9011 and 28 U.S.C. § 1927, Filler King seeks to impose sanctions upon the Trustee and the Trustee's counsel. Filler King contends sanctions are appropriate because the Trustee's Memorandum in Opposition to the Defendant's Motion to Dismiss "is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law."

The arguments made by the Trustee are found not to be convincing but the arguments were made in good faith. Further, as discussed above, some courts have held in accordance with the arguments made by the Trustee.

Nevertheless, Filler King asserts that the Court should impose sanctions because the Trustee failed to disclose that his position was in the minority. However, the Trustee's memorandum is a response brief. Filler King's brief, which was filed prior to the Trustee's response, more than adequately informs the court what the majority of courts have ruled. Once the Filler King informed the court of the majority rule, there was no need for the Trustee to reiterate that point. Filler King's motion for sanctions will be denied.

### CONCLUSION

For the reasons stated above, Filler King's motion to dismiss will be granted, and Filler King's motion for sanctions will be denied.

A separate order will be entered.

